

This opinion was
filed for record
at 8am on Aug. 1, 2019

_____ Deputy
for Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 95971-4 |
| | ) | |
| Respondent, | ) | EN BANC |
| | ) | |
| v. | ) | Filed ___AUG 0 1 2019___ |
| | ) | |
| THERESA GAIL SCANLAN, | ) | |
| | ) | |
| Petitioner. | ) | |
| | ) | |

FAIRHURST, C.J.—In this case, we consider whether a crime victim's statements to his medical providers were testimonial and, if so, whether their admission at trial violated the defendant's right of confrontation under the Sixth Amendment to the United States Constitution.[1] We hold that the victim's statements in this case were nontestimonial because they were not made with the primary purpose of creating an out-of-court substitute for trial testimony. We separately hold

---

[1] See Crawford v. Washington, 541 U.S. 36, 53, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (If an out-of-court statement by a nontestifying declarant is "testimonial," then its admission at trial violates the Sixth Amendment's confrontation clause unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination.).

that there was sufficient evidence to support the petitioner's unlawful imprisonment conviction. We affirm the Court of Appeals.

## I. FACTS AND PROCEDURAL HISTORY

A.     Factual background

Roughly a decade after his wife of over 50 years died, 82 year old Leroy Bagnell met a woman in a bar. He initially introduced 57 year old Theresa Gail Scanlan to his children as a friend, and within a month or two she moved into his house. At some point, he began referring to her as his girlfriend.

About a year later on October 16, 2014, the police responded to a 911 hang-up call made from Bagnell's house. Scanlan answered the door and told the police she had been having an argument with her roommate. Bagnell then appeared at the top of the stairs wearing a T-shirt and underwear. His head and forearm were bleeding, and he had a big, bloody, and bruised lump on his leg. When the police asked Bagnell how he had been injured, Scanlan replied that Bagnell had fallen out of his car. As a result of this incident, the Federal Way Municipal Court issued a domestic violence no contact order prohibiting Scanlan from coming within 1,000 feet of Bagnell's house. Bagnell did not seek medical care for his injuries.

On November 6, 2014, Bagnell's children became concerned when they were unable to reach him all day on either his cell phone or landline. All four children went to the house, arriving around 5:30 p.m. They found the lights out and the shades

2

drawn, and they got no answer when they knocked and rang the bell. They let themselves in with a key. There was blood on the entryway carpet, on the stairs, and throughout the upstairs bedrooms. The stairway wall had been dented and gouged, and the kitchen floor was littered with shattered glass and broken ceramic figurines.

There was more blood in the family room, along with a large trash can containing a broken, bloodstained broom handle and a broken golf club. There was a hammer on the coffee table and a crowbar on the dining table. Bagnell was also in the family room, sitting in a chair in the dark with his eyes closed. Bagnell was severely bruised from head to toe. His children called 911. All four children and the responding police officer testified that Bagnell was initially nonresponsive, then dazed and in a state of shock and confusion. Three of his children thought that he was dead or possibly unconscious.

Scanlan was found in the garage underneath a blanket in her car with the doors locked. When the police arrived and removed Scanlan from the car, Bagnell's daughter shouted at her that she could have killed him. Scanlan replied that it was "not that bad." 6 Transcript of Proceedings (TP) (Nov. 18, 2015) at 769; 8 TP (Nov. 23, 2015) at 1071.

Bagnell was taken to the emergency room, where he was treated by Nurse Catherine Gay, Dr. Robert Britt, and social worker Jemima Skjonsby. In addition to extensive bruising, he also had two broken fingers and several skin tears on his legs

and arms. The police subsequently arrived around midnight, spoke to Bagnell, and had him sign a medical release form authorizing St. Francis Hospital and its staff to release his medical records to police and prosecutors.

On November 12, 2014, the police met with Bagnell at his house and obtained a second medical release form for Virginia Mason Medical Center. The next day, Bagnell met with Dr. Curtis Endow, his primary care physician, at Virginia Mason. Dr. Endow referred Bagnell to a wound care clinic at Virginia Mason, where he subsequently received care from physician assistant Stacy Friel and Dr. Jessica Pierce.

B.     Procedural history

Scanlan was charged with second degree assault, felony violation of a no contact order, unlawful imprisonment, and fourth degree assault. Neither Bagnell nor Scanlan testified at trial, but the court admitted several statements that Bagnell made to his medical providers.

Nurse Gay testified that when she asked what had happened to him, Bagnell told her "that his girlfriend had beaten him up, and that he'd had a no contact order on this individual." 8 TP at 1108-09. When she asked him about a ring mark that she noticed on the back of his neck, "[h]e told me that his girlfriend . . . had tried to strangle him with his sweatshirt and had pulled the sweatshirt so hard, it had left this permanent ring around the back of his neck." *Id.* at 1110. She clarified on cross-

4

examination that she could not recall whether he had used the word "strangled," but that "she, you know, did whatever with the sweatshirt and had it really tight." *Id.* at 1118. Gay testified that knowing how a patient's injury occurred and the identity of his assailant is important for monitoring hospital security and patient safety, determining whether to refer him to a social worker, and ensuring that he has the follow-up care he needs, including having a safe place to go after discharge.

Dr. Britt testified that Bagnell stated "that he had been in his home for two days, that he had been imprisoned, or at least held in his home, against his will," that "he hadn't really eaten in a [] couple of days," and that "[h]e wasn't allowed to talk to his family." 7 TP (Nov. 19, 2015) at 925. Dr. Britt also testified that Bagnell "said that he was hit with fists, that he had been bitten in a couple of places[,] and that he had been hit with a broom." *Id.* at 925-26. Dr. Britt stated that it was important to determine how patients' injuries occur because the mechanism of the injury determines how serious it is and affects which tests he runs, and it impacts discharge planning.

Social worker Skjonsby testified that when she asked Bagnell whether he felt safe to go home, he responded "[t]hat he was relieved that this person had been removed from the home by police and that he wouldn't have to worry about it again." *Id.* at 883-84. Skjonsby stated that knowing about a patient's relationship with his

assailant and knowing whether the assailant is in police custody helps her assess for safe discharge and connect the patient with appropriate social work services.

Dr. Endow testified that when he asked how Bagnell had been injured, Bagnell "stated that he received the injuries during an assault" by "[h]is girlfriend." *Id.* at 818. Dr. Endow stated that to effectively treat patients he needs to know how an injury occurred—whether the injury is related to underlying medical conditions, is due to accidents, occurred from fainting or in the course of medical care, and so on. Dr. Endow further stated that it is important to know the identity of a patient's assailant to know whether the patient is still in potential danger and to know whether to refer the patient to Virginia Mason's social services department.

Physician assistant Friel testified that when she asked Bagnell how his injuries occurred, he told her that "[h]e was living with a girlfriend at the time who had locked him in a room and had beat him with a candlestick, a broom, and a hammer over multiple areas." 8 TP at 1181. Friel explained that it was important to know for treatment purposes whether an injury had been caused by an object (versus, say, a hand) to make sure that no foreign bodies remain in the wound. Friel stated that knowing the identity of an assailant influences treatment because she wants to ensure that the patient has a safe place to go and is not returning to an environment that could result in more wounds.

Dr. Pierce testified that when she asked Bagnell how his injuries occurred, "[h]e said that it was as a result of domestic violence. . . . He told me he was hit with a candlestick, a broom. He was punched or hit—I want to say a hammer, something hard." 7 TP at 909. Dr. Pierce stated that it was important to know the mechanism of injury because there is a high recidivism rate for wound patients. Accordingly, her practice involves not only treatment of existing wounds but also prevention of new wounds by, for example, having patients install grab bars in their homes. In addition, Dr. Pierce testified that knowing whether patients are returning to a safe environment is important from a treatment standpoint because more wounds result in more surface area to bandage and treat, which results in longer healing time, more potential for infection, and other complications.

The jury convicted Scanlan of second degree assault, felony violation of a no contact order, and unlawful imprisonment. On appeal, Scanlan argued that admitting Bagnell's hearsay statements to his medical providers violated her confrontation clause rights and that there was insufficient evidence to support her unlawful imprisonment conviction. The Court of Appeals held that Bagnell's statements to medical personnel were nontestimonial[2] and therefore not subject to the

---

[2] In contrast, the Court of Appeals held that two statements made by Bagnell to police officers were testimonial but that their admission at trial constituted harmless error. *State v. Scanlan*, 2 Wn. App. 2d 715, 731-33, 413 P.3d 82 (2018). The State has not sought our review of this holding.

confrontation clause, and it sustained her unlawful imprisonment conviction.[3] We granted Scanlan's petition for review and now affirm the Court of Appeals. *State v. Scanlan*, 191 Wn.2d 1026 (2018).

## II. ANALYSIS

A.   Bagnell's statements to his medical providers were not testimonial because they were not made with the primary purpose of creating an out-of-court substitute for trial testimony

Scanlan first contends that Bagnell's statements to his medical providers were testimonial and that admitting them therefore violated the confrontation clause of the United States Constitution. We review confrontation clause challenges de novo. *State v. Price*, 158 Wn.2d 630, 638-39, 146 P.3d 1183 (2006).

1.    *The primary purpose test governs our analysis*

The Sixth Amendment, made applicable to the states by the Fourteenth Amendment,[4] states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The Court of Appeals below correctly observed that "confrontation clause jurisprudence has been in rapid flux since the United States Supreme Court's 2004 decision in *Crawford* [*v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)]." *State v.*

---

[3] The Court of Appeals also reduced Scanlan's felony violation of a no contact order to a misdemeanor violation of a no contact order on double jeopardy grounds. *Scanlan*, 2 Wn. App. 2d at 735. The State conceded this issue below and does not now challenge it.

[4] *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

*Scanlan*, 2 Wn. App. 2d 715, 725, 413 P.3d 82 (2018). In *Crawford*, the Supreme Court held that whether admission of an out-of-court statement by a declarant who does not testify at trial violates the confrontation clause depends on whether the statement was *testimonial*—not, as it had previously held, whether the statement was *reliable*. 541 U.S. at 53, 68 (abrogating *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)). If the statement was testimonial, then it is inadmissible unless the witness is unavailable at trial and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 59, 68. Reasoning that "the principal evil at which the Confrontation Clause was directed" was the use, in traditional civil-law systems, of "ex parte examinations as evidence against the accused" in criminal proceedings, the Court held that a hearsay declarant's statements to police during a station house interview were testimonial. *Id.* at 50, 68.

The Court in *Crawford* declined to fashion a legal test or "to spell out a comprehensive definition of 'testimonial.'" *Id.* at 68. And so in *State v. Shafer*, 156 Wn.2d 381, 128 P.3d 87 (2006), we articulated our own "declarant-centric" test for determining whether a statement was testimonial.[5] At the same time, the Court of Appeals began struggling with the very question we face today: whether crime

---

[5] *Shafer*'s declarant-centric test asks "whether a reasonable person in the declarant's position would anticipate his or her statement being used against the accused in investigating and prosecuting the alleged crime. The inquiry focuses on the declarant's intent by evaluating the specific circumstances in which the out-of-court statement was made." 156 Wn.2d at 390 n.8; *State v. Beadle*, 173 Wn.2d 97, 107, 265 P.3d 863 (2011) (describing this test as a "declarant-centric standard").

victims' statements to their medical providers are testimonial. *See, e.g., State v. Fisher*, 130 Wn. App. 1, 10-13, 108 P.3d 1262 (2005); *State v. Moses*, 129 Wn. App. 718, 729-30, 119 P.3d 906 (2005) (published in part); *State v. Saunders*, 132 Wn. App. 592, 603, 132 P.3d 743 (2006). The Court of Appeals' deliberation eventually coalesced into a three-factor test:

> Witness statements to a medical doctor are not testimonial (1) where they are made for diagnosis and treatment purposes, (2) where there is no indication that the witness expected the statements to be used at trial, and (3) where the doctor is not employed by or working with the State.

*State v. Sandoval*, 137 Wn. App. 532, 537, 154 P.3d 271 (2007).

Meanwhile in *Davis v. Washington*, the United States Supreme Court announced what has since become known as the primary purpose test:

> Statements are *nontestimonial* when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency*. They are *testimonial* when the circumstances objectively indicate that there is no such ongoing emergency, and that the *primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution*.

547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (emphasis added).

Applying this test, the Court held that a wife's 911 call identifying her assailant in the midst of a domestic violence episode was nontestimonial because the call's primary purpose was to enable police assistance to meet an ongoing emergency. *Id.* at 823-29. On the other hand, another domestic violence victim's interview

10

statements to the police after they had arrived and separated her from her assailant were testimonial because the primary purpose of the interrogation was "to investigate a possible crime." *Id.* at 830.

In *Michigan v. Bryant*, the Court further clarified that to determine the primary purpose of a police interrogation, courts should "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." 562 U.S. 344, 359, 131 S. Ct. 1143, 179 L. Ed. 2d (2011). "[T]he statements and actions of both the declarant and interrogators" are relevant to this inquiry. *Id.* at 367; *cf. id.* at 381-82 (Scalia, J., dissenting) (stating, contra the majority, that only the declarant's state of mind is relevant to the primary purpose inquiry).

In light of *Davis* and *Bryant*, we held that the primary purpose test, rather than our earlier declarant-centric test as announced in *Shafer*, applies to statements made to law enforcement officers. *State v. Beadle*, 173 Wn.2d 97, 109, 265 P.3d 863 (2011) ("Based on the evolution of the law since *Shafer*, we conclude that the *Shafer* standard does not apply to statements made to law enforcement."); *see also State v. Ohlson*, 162 Wn.2d 1, 16, 168 P.3d 1273 (2007) ("*Davis* indicated that the objectively determined primary purpose of a police interrogation is decisive in evaluating whether a resulting statement is testimonial.").

But the Court of Appeals continued to struggle with the question of how to analyze statements made to nongovernmental witnesses—i.e., witnesses other than

11

law enforcement officers. *See Davis*, 547 U.S. at 823 n.2 (United States Supreme Court declining to "consider whether and when statements made to someone other than law enforcement personnel are 'testimonial'"); *Bryant*, 562 U.S. at 357 n.3 ("We have no need to decide that question in this case either."). In *State v. Hurtado*, the Court of Appeals acknowledged that the primary purpose test governs analysis of statements made to law enforcement officers but reasoned that *Shafer*'s "'declarant-centric standard'" still governed statements made to "nongovernmental witness[es]," including medical providers. 173 Wn. App. 592, 599-600, 294 P.3d 838 (2013) (analyzing statements made by a crime victim to an emergency room nurse) (quoting *Beadle*, 173 Wn.2d at 107-08). The court further reasoned that the second and third factors of the *Sandoval* test "incorporate *Shafer*'s 'declarant-centric standard' because the declarant must make the statement to a nongovernmental witness." *Id.* at 600. *Hurtado* thereby synthesized *Shafer*'s declarant-centric test and *Sandoval*'s three-factor test into a single test to analyze whether statements made to medical providers were testimonial.

Although it was originally formulated in the context of police interrogation, the United States Supreme Court has now clarified that the primary purpose test also governs courts' analysis of hearsay statements made to nongovernmental witnesses. In *Ohio v. Clark*, the Court held that a three year old's statements to his preschool teachers, when asked about the identity of his abuser, were not testimonial. __ U.S.

12

___, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015). The Court reasoned that "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers," and noted that "the relationship between a student and his teacher is very different from that between a citizen and the police." *Id.* at 2182.

The Court held that the facts in *Clark* constituted an ongoing emergency involving suspected child abuse. *Id.* at 2181. "The teachers' questions were meant to identify the abuser in order to protect the victim from future attacks." *Id.* Moreover, the child's age made it unlikely that such a declarant "would intend his statements to be a substitute for trial testimony." *Id.* at 2182. Nor did the fact that the teachers were mandatory reporters of child abuse render the statements testimonial: "mandatory reporting statutes alone cannot convert a conversation between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for a prosecution." *Id.* at 2183. "[C]onsidering all the relevant circumstances," the Court concluded that the child's statements "were not made with the primary purpose of creating evidence for Clark's prosecution." *Id.* at 2181.

Notwithstanding *Clark*, the trial court and both parties in this case appear to have agreed at the trial court level that the *Sandoval* test, as reapplied and synthesized with *Shafer*'s declarant-centric test in *Hurtado*, governed their analysis

13

of whether Bagnell's statements to his medical providers were testimonial. On appeal Division One disagreed, holding that in light of *Clark*, "the proper test to apply in determining whether the statements made to medical providers are testimonial is the 'primary purpose' test." *Scanlan*, 2 Wn. App. 2d at 725.[6] Scanlan now urges us to reinstate *Hurtado*'s synthesis of the *Sandoval* three-factor and *Shafer* declarant-centric tests.

The United States Supreme Court in *Clark* declared that "the primary purpose test is a *necessary . . . condition* for the exclusion of out-of-court statements under the Confrontation Clause." 135 S. Ct. at 2180-81 (emphasis added). "[U]nder our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." *Id.* at 2180. Any legal test for determining whether a statement was testimonial that is inconsistent with the primary purpose test is thus no longer good law.

*Shafer*'s declarant-centric test is inconsistent with the primary purpose test, which considers "the statements and actions of *both* the declarant *and* interrogators." *Bryant*, 562 U.S. at 367 (emphasis added). *Sandoval*'s three-factor test is also inconsistent since it permits a statement to be nontestimonial only if, inter

---

[6] Division Two has followed suit. *See State v. Burke*, 6 Wn. App. 2d 950, 965, 431 P.3d 1109 (2018) ("In *Scanlan*, Division One adopted the primary purpose test from *Clark* and applied it to a victim's statements to a variety of medical providers. We agree with Division One." (citation omitted)).

14

alia, there is *"no indication* that the witness expected the statements to be used at trial." *Sandoval*, 137 Wn. App. at 537 (emphasis added). In contrast, the primary purpose test asks "whether, in light of all the circumstances, viewed objectively, the *'primary purpose'* of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Clark*, 135 S. Ct. at 2180 (emphasis added) (alteration in original) (quoting *Bryant*, 562 U.S. at 358).

It is therefore time to fully put these tests to rest. We hold that *Shafer*'s declarant-centric test, *Sandoval*'s three-factor test, and *Hurtado*'s synthesis of the two have all been superseded by the primary purpose test. Accordingly, we consider whether Bagnell's statements to medical personnel were testimonial by applying the primary purpose test.

### 2. *Application of the primary purpose test*

At issue are Bagnell's statements to emergency room personnel Gay, Dr. Britt, and Skjonsby, and his statements to follow-up care providers Dr. Endow, Friel, and Dr. Pierce. We hold that none of these statements were testimonial because their primary purpose was to meet an ongoing emergency and obtain medical treatment, not to create an out-of-court substitute for trial testimony.

Under the primary purpose test, courts objectively evaluate the circumstances in which the encounter occurs, as well as the parties' statements and actions. *Bryant*, 562 U.S. at 359. The Court has variously declared that a statement is testimonial if

15

its primary purpose was "to establish or prove past events potentially relevant to later criminal prosecution," *Davis*, 547 U.S. at 822, "to investigate a possible crime," *id.* at 830, "to create a record for trial," *Bryant*, 562 U.S. at 358, or to "creat[e]" or "gather[] evidence for . . . prosecution," *Clark*, 135 S. Ct. at 2181, 2183. "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Clark*, 135 S. Ct. at 2180 (alteration in original) (quoting *Bryant*, 562 U.S. at 358).

As a threshold matter, Bagnell's statements are "significantly less likely to be testimonial than statements given to law enforcement officers" because medical personnel are "not principally charged with uncovering and prosecuting criminal behavior." *Clark*, 135 S. Ct. at 2182. We also note that the United States Supreme Court has consistently said in dicta that statements made to medical providers for the purpose of obtaining treatment have a primary purpose that does not involve future prosecution and that such statements are therefore nontestimonial. *See Giles v. California*, 554 U.S. 353, 376, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008) ("[O]nly *testimonial* statements are excluded by the Confrontation Clause. . . . [S]tatements [by domestic abuse victims] to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules."); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) ("[M]edical reports

created for treatment purposes . . . would not be testimonial under our decision today."); *Bullcoming v. New Mexico*, 564 U.S. 647, 672, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011) (Sotomayor, J., concurring in part) ("[T]his is not a case in which the State suggested an alternate purpose, much less an alternate *primary* purpose, for the [blood alcohol concentration] report. For example, the State has not claimed that the report was necessary to provide Bullcoming with medical treatment.").

Bagnell's statements to medical providers describing the cause of his injuries were elicited for the purpose of obtaining medical treatment. Dr. Britt, Dr. Endow, Friel, and Dr. Pierce all testified that knowing the mechanism of a patient's injury is important because it affects the course of treatment. Dr. Britt stated that the mechanism of injury determines how serious it is and affects which tests he runs. Dr. Endow stated that knowing how the injuries occurred and the timing of the injuries is important for treatment. Friel testified that when treating patients, she needs to know whether she might need to do imaging to look for foreign bodies in the wound. Dr. Pierce stated that knowing the cause of wounds is important to help prevent wound recidivism, for which the rate among her patients is "unbelievably high." 7 TP at 908.

Like the preschooler's statements identifying his abuser in *Clark*, Bagnell's statements identifying Scanlan as his assailant were elicited by "questions . . . meant to identify the abuser in order to protect the victim from future attacks." 135 S. Ct.

17

at 2181. While Bagnell knew that Scanlan had been taken into police custody, his medical providers did not. His statements were elicited by questions whose purpose was to determine whether there was an ongoing emergency and, if so, to respond to it. Gay, Dr. Britt, Skjonsby, Dr. Endow, Friel, and Dr. Pierce all testified that they were concerned about patient safety and that one of their purposes in speaking with patients is to help ensure that the patient has a safe place to go after discharge. Gay testified that her questioning was also important for hospital security purposes. "[I]n light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation" was not "to 'creat[e] an out-of-court substitute for trial testimony.'" *Id.* at 2180 (second alteration in original) (quoting *Bryant*, 562 U.S. at 358).

Scanlan asserts that Bagnell's statements were testimonial because he signed three medical release forms authorizing his care facilities and their staff to release his medical records to police and prosecutors.[7] But just as the preschool teachers' mandatory reporting obligations in *Clark* did not "convert a conversation between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for a prosecution," neither did Bagnell's signing medical release forms transform his medical care provider-patient relationships into law enforcement missions. *Id.* at 2183. This is true for all of Bagnell's medical providers,

---

[7] Scanlan introduced two of these forms as pretrial exhibits. Scanlan alleges, and the State does not appear to contest, that Bagnell signed an additional medical release form on October 16, 2014 after the no contact order incident.

18

and it is especially true for the St. Francis providers. At the time Bagnell received emergency room care at St. Francis on November 6, 2014, he had signed only a release form for *Virginia Mason* for injuries related to the *October 16, 2014* incident.[8] But even for the later follow-up care at Virginia Mason, it seems implausible that the primary purpose of his interactions was to create an out-of-court substitute for trial testimony. *Cf. id.* at 2183 ("It is irrelevant that the teachers' questions and their duty to report the matter had the natural tendency to result in Clark's prosecution."). To the contrary, the primary purpose of Bagnell's interactions with Dr. Endow, Friel, and Dr. Pierce was to periodically debride and redress the wounds on his arms and legs, which by that point had developed into ulcers. The fact that Bagnell had signed waivers allowing the police to obtain his medical records did not alter the primary purpose of these interactions.

Bagnell's statements to medical personnel were therefore nontestimonial, and their admission at trial did not violate Scanlan's Sixth Amendment right of confrontation.

---

[8] Since this first release form is not in the record, we must rely on Scanlan's attorney's statement to the trial court that the form granted Virginia Mason permission to release Bagnell's medical information. And since the second and third forms authorize the release of medical records "acquired and developed in the course of treating me for my injuries and/or illness suffered on or about _____," with the blank on those forms filled in as "11/5/2014-11/6/2014" and "11/5/14-11/6/14" respectively, it follows that on the first form the police would have filled in this blank as October 16, 2014—the date on which the earlier incident occurred. Def.'s Pretrial Exs. 8, 9.

19

B.     There is sufficient evidence to support Scanlan's unlawful imprisonment conviction

Scanlan next contends that there is insufficient evidence to support her unlawful imprisonment conviction. To determine whether there is sufficient evidence to support a criminal conviction, "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). When a criminal defendant challenges sufficiency of the evidence, "all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (citation omitted). "'Circumstantial evidence and direct evidence are equally reliable' in determining the sufficiency of the evidence." *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010) (quoting *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004)). However, "inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

"A person is guilty of unlawful imprisonment if he or she knowingly restrains another person." RCW 9A.40.040(1). "'Restrain' means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty. Restraint is 'without consent' if it is accomplished by . . . physical force, intimidation, or deception." RCW 9A.40.010(6).

Bagnell's statements to medical personnel provide sufficient direct evidence to support Scanlan's unlawful imprisonment conviction. Dr. Britt testified that Bagnell told him "that he had been in his home for two days, that he had been imprisoned, or at least held in his home, against his will," that "he hadn't really eaten in a [] couple of days," and that "[h]e wasn't allowed to talk to his family." 7 TP at 925. Friel testified that Bagnell told her "[h]e was living with a girlfriend at the time who had locked him in a room and had beat him with a candlestick, a broom, and a hammer over multiple areas." 8 TP at 1181.

The conviction is further supported by circumstantial evidence. Bagnell's children testified that they had been unable to reach him by cell phone or landline for roughly 24 hours before they arrived on November 6, 2014. They testified that his cell phone said it was disconnected or went to voice mail and that his landline either rang indefinitely or went to voice mail. Witnesses testified that in Bagnell's house the police found a cell phone broken in two, a cordless phone missing its

21

battery cover and batteries (which were found in the trash), and a second damaged cordless handset, and that the upstairs bedroom cordless phone did not emit a dial tone.

All four children and multiple police officers testified that there was blood throughout the house, that the wall had been dented and gouged, and that there were broken and weapon-like items throughout the house—including a broken golf club; a broken, bloodstained broom; a hammer; and a crowbar. The nature and extent of Bagnell's injuries were supported by testimonial and photographic evidence and were not in dispute. Scanlan was found hiding on the scene and responded to Bagnell's daughter's accusation by stating that his injuries were "not that bad." 6 TP at 769; 8 TP at 1071. Taken together, the circumstantial evidence supports a reasonable inference that Scanlan knowingly restrained Bagnell, restricting his movements to his house by means of physical force or intimidation.

Citing *State v. Kinchen*, 92 Wn. App. 442, 452 n.16, 963 P.2d 928 (1998), Scanlan asserts that she could not have unlawfully imprisoned Bagnell because there were multiple means of escape. In *Kinchen*, the Court of Appeals held that evidence that the victims were locked in their apartment was insufficient to support an unlawful imprisonment conviction when uncontested evidence also showed that the victims regularly entered and exited through a window and that a sliding glass door was sometimes left unlocked. 92 Wn. App. at 451-52. The court reasoned that for an

unlawful imprisonment theory to succeed despite a known means of escape, "the known means of escape must present a danger or more than a mere inconvenience." *Id.* at 452 n.16. Here, Scanlan argues, "Mr. Bagnell was at his home, with multiple entrances and windows, including a three-car garage." Pet'r's Suppl. Br. at 19.

But the evidence, viewed in the light most favorable to the prosecution, supports a reasonable inference that leaving would have presented more than a mere inconvenience for Bagnell. Multiple witnesses testified that Bagnell was initially in a nonresponsive stupor, unaware of his surroundings. Moreover, Bagnell's injuries, the state of the house, and his prior history with Scanlan support a reasonable inference that leaving presented a danger.

Because both the direct and circumstantial evidence support Scanlan's conviction for unlawful imprisonment, we affirm her conviction.

## III. CONCLUSION

*Clark* makes clear that the primary purpose test governs analysis of whether statements to nongovernmental witnesses, including medical personnel, were testimonial. Under the primary purpose test, Bagnell's statements to medical personnel were nontestimonial and, therefore, their admission at trial did not violate the federal constitution's confrontation clause. In addition, there is sufficient evidence in the record to support Scanlan's unlawful imprisonment conviction.

We affirm the Court of Appeals.

Fairhurst, C.J.

WE CONCUR:

Madsen, J.

Wiggins, J.

González, J.

Stephens, J.

Yu, J.

24

No. 95971-4

GORDON McCLOUD, J. (concurring)—I concur in the majority's analysis

of federal constitutional law with two observations.

First, I note that the majority's analysis is limited to "the defendant's right of

confrontation under the Sixth Amendment to the United States Constitution."

Majority at 1; U.S. CONST. amend. VI. Theresa Scanlan failed to argue for a

different outcome under article I, section 22 of the Washington State Constitution,[1]

which we analyze independently from the federal constitution. *State v. Lui*, 179

Wn.2d 457, 468-70, 315 P.3d 493 (2014) ("This court has concluded that article I,

section 22 merits an independent analysis as to both the manner and the scope of the

confrontation right." (citing *State v. Pugh*, 167 Wn.2d 825, 835, 225 P.3d 892

(2009))); *State v. Martin*, 171 Wn.2d 521, 528-33, 252 P.3d 872 (2011) (conducting

---

[1] "In criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . . ." WASH. CONST. art. I, § 22.

a *Gunwall*[2] analysis and concluding that an independent analysis of article I, section 22 was necessary); *Pugh*, 167 Wn.2d at 834-35 (stating that "a *Gunwall* analysis is no longer necessary" and independently analyzing article I, section 22). Whether article I, section 22 provides greater protections to defendants than the federal constitution in this context remains unanswered.

Second, I note that the United States Supreme Court has not "adopt[ed] a categorical rule excluding [statements to individuals who are not law enforcement officers] from the Sixth Amendment's reach." *Ohio v. Clark*, __ U.S. __, 135 S. Ct. 2173, 2181, 192 L. Ed. 2d 306 (2015). Although "such statements are much less likely to be testimonial than statements to law enforcement officers," *id.*, "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony,'" *id.* at 2180 (alteration in original) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011)).

In this case, however, I cannot say that the *primary* purpose of the statements at issue was to create an out-of-court substitute for trial testimony. This is particularly true of the statements made to Nurse Catherine Gay, Dr. Robert Britt, and social worker Jemima Skjonsby at the emergency room on the night of the

---

[2] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

incident. All three saw Leroy Bagnell in the informal, spontaneous setting of an *emergency* room shortly after his children discovered him nonresponsive in his home, majority at 2-4, and all three were primarily concerned with Bagnell's safety—they did not want to release him into a potentially dangerous situation, *id.* at 4-6, 17-18. In this way, the situation at the emergency room is not unlike the situation at the school in *Clark*, where "the teachers needed to know whether it was safe to release [the child] to his guardian at the end of the day." 135 S. Ct. at 2181.

I am more concerned with Bagnell's statements to Dr. Curtis Endow, physician assistant Friel, and Dr. Jessica Pierce, which he made 7, 12, and 20 days after the incident, respectively. By the time Bagnell met with these three medical providers, he had signed multiple medical release forms authorizing police and prosecutors to obtain his medical records "in furtherance of the investigation and any resulting prosecution." Majority at 3-4, 18-19; Pet'r's Suppl. Br., App. A. The forms also authorized his "care providers" to "discuss [his] medical condition and any treatment with the assigned detective, his/her designee, and the prosecuting attorney." Pet'r's Suppl. Br., App. A. After meeting with the police and signing all these forms, Bagnell was well aware that the police were heavily involved, would almost certainly review his medical records, and might even talk with his medical providers. And unlike the child in *Clark*, who was too young to "understand the

3

details of our criminal justice system," 135 S. Ct. at 2182, Bagnell is old enough to understand those details. Bagnell likely knew that anything he said to his medical providers about the incident would end up in his medical records, records that the police or prosecutors would then obtain. He also may have known that prosecutors might use those records in a future trial, should one occur. It is therefore probable that his conversations with medical providers served a *dual* purpose: to ensure adequate medical treatment *and* to create an out-of-court substitute for trial testimony.

But it is a stretch to say that the *primary* purpose of those conversations was to create an out-of-court substitute for trial testimony. Bagnell most likely would have seen the same medical providers, even if he had not signed the release forms, for the sole purpose of receiving follow-up care. After signing those forms, his follow-up visits may have taken on an additional purpose. But it is unlikely that this additional purpose was ever primary, over and above his purpose of receiving medical treatment. And the record before us suggests that the medical providers were also primarily, if not solely, concerned with Bagnell's well-being. Majority 4-7.

With these observations, I respectfully concur in the majority's analysis of federal constitutional law.