IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 86559-5-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| BRYSON THOMAS MORGAN, | |
| Appellant. | |

BOWMAN, A.C.J. — Bryson Thomas Morgan appeals his jury conviction for first degree murder with a firearm enhancement.  Morgan argues (1) the trial court erred when it denied his peremptory challenge under GR 37, (2) it erred by admitting irrelevant prejudicial evidence, (3) the prosecutor improperly elicited testimony about and commented on Morgan's right to pre-arrest silence, (4) insufficient evidence supports his murder conviction, and (5) cumulative error deprived him of his right to a fair trial.  We affirm.

FACTS

At about 4:00 a.m. on January 14, 2021, Trader Joe's assistant manager Truston Silva was opening the store for arriving staff at the Capitol Hill location in Seattle.  He found a person, later identified as Morgan, passed out in the driver's seat of a Toyota sedan at an intersection stoplight.  The car was running.  Silva knocked on the window a couple of times but Morgan did not wake up.  Silva noticed that the front passenger seat of the car "appeared to be wet" and that the

liquid was "in the shape of . . . or in the outline of a person's body." He also saw a "high-end designer bag" in the back seat with women's clothing on top of it. Silva called 911 and Seattle police officers arrived shortly after.

Seattle Police Officer Robert Bulloch and his partner Officer Christopher McMahon responded to the 911 call. They walked up to the car, and Officer Bulloch shined his flashlight into the driver's compartment. They saw Morgan in the driver's seat unresponsive. The officers opened the driver's door and woke Morgan, who "seemed . . . in shock," then removed him from the from the car. Morgan had blood and mud on his clothes and shoes but was not injured or bleeding. And he had what appeared to be brain matter on his clothes. When an officer asked, "So none of that blood in that car is from you," Morgan replied, "No, sir." Morgan insisted he was fine but gave officers no other information about how he ended up in the intersection covered in blood.

Officers saw a "large amount" of "blood or some sort of red liquid sprayed or splattered throughout" the car. They found two spent shell casings in the front passenger seat and a Glock-style pistol with "obliterated" serial numbers in the center console. The car did not have license plates, but officers found a temporary plate under a seat.[1] They also found more bullet casings, a fired bullet, a wallet with Morgan's identification, his passport, suspected methamphetamine, and a cell phone throughout the car.

At around 5:30 that same morning, Wesley Hiserman was on his morning run in Seward Park when he found the naked body of a woman. Much of the

---

[1] The officers also noticed tape residue on the rear window where the temporary license plate had been.

woman's face was "missing" and there was a lot of blood on and around her. Hiserman called 911 and Seattle police responded.

Between the park's paved path and where Hiserman found the woman's body by the lakeshore, officers saw "a path carved in the mud as if someone had been dragged through it." They also found a black sock in the "drag marks" closest to the paved path. Officers recovered a bullet and bullet fragments from under her body. Near her body, they found an unfired bullet, a piece of plastic inside balled-up clothing that appeared to be car trim, and another black sock. There was a third black sock found between the victim's legs that appeared to match the sock found near the paved path.

The woman was later identified as Autumn Young. An autopsy confirmed that Young died of several gunshots to the head. There were five entrance wounds on the left side of her head and five exit wounds on the right side of her head. The bullets all travelled from left to right and were fired from within two to three feet of Young. Forensic examiners determined that the bullets found near Young's body were fired from the same gun found in the center console of Morgan's car. And they matched the DNA blood samples found on Morgan and in his car to Young. Finally, detectives determined that the cell phone in Morgan's car belonged to Young. Young's phone records showed that she made a call from her phone at 1:54 a.m. on January 14, 2021.

Morgan's cell phone records showed that his phone travelled from north Seattle to Seward Park between 1:30 and 3:24 a.m. on January 14. The phone remained in Seward Park for about 12 minutes. At 3:32 a.m., Morgan called his

3

father, Thomas Morgan. On the call, his father heard water in the background. Morgan sounded "really distraught" and told his father, "I didn't sign up for this." But he assured his father that he was okay and did not want him to come get him. By 3:59 a.m., the phone travelled to Capitol Hill.

On January 20, 2021, the State charged Morgan with first degree murder of Young with a firearm enhancement. The case went to jury trial in January 2024. During voir dire, Morgan's attorney and juror 82 had the following exchange:

> [DEFENSE COUNSEL]: . . . .
> Juror 82, tell me a little bit about your thoughts about serving on this jury.
> JUROR NO. 82: I'm not excited.
> [DEFENSE COUNSEL]: You're not excited. Yeah. You don't look excited. Can you tell me why?
> JUROR NO. 82: It's very serious. It's heavy, a criminal trial.
> [DEFENSE COUNSEL]: Yeah. I mean, that was one of the questions, too, on [the juror questionnaire] was, does anyone have any moral or religious or philosophical issues judging someone or making decisions on a jury. I don't know, did you check "yes" to that?
> JUROR NO. 82: No. I consider it a civic responsibility, but it's not one that I have to be excited about.
> [DEFENSE COUNSEL]: Sure. Okay. And putting that aside, obviously, you not being excited, I mean, do you feel like this is a case that you would be a good juror on?
> JUROR NO. 82: I — I don't have any specific objections other than maybe having difficulty giving credibility to witnesses who are heavy drug users —
> [DEFENSE COUNSEL]: Okay.
> JUROR NO. 82: — if that was to come up. I'm not really sure in what sense drugs are involved in this case.
> [DEFENSE COUNSEL]: Yeah. I know you don't know anything really, but just kind of what little you do know, I'm trying to get at if this would be a tough case for you to sit on.
> JUROR NO. 82: I think only in the sense that it's a murder case.

4

[DEFENSE COUNSEL]: Okay. But it sounds like you would take that role seriously.

JUROR NO. 82: Yes.

During peremptory challenges, Morgan moved to strike juror 82. The court noted that the juror "identifies as BIPOC"[2] and raised a GR 37 objection. Morgan's counsel explained that the juror was

just simply not excited about being on the jury, didn't seem happy to want to do it, but more importantly, from what we're concerned, is that she indicated she would have trouble giving credibility to anyone who is a drug user or uses drugs, and I have some concerns that that may impact her . . . [.] [T]here could be evidence, if my client testifies, that there was drug use. She indicated that she would . . . not give him credibility because of that.

The court denied the peremptory challenge. It explained that it was "going to deny the challenge for the following reasons":

This witness did say that she was not excited to serve, but there were other jurors that were present in the room that also had similar feelings. Regarding the credibility of heavy drug users, I wrote that in my notes as well, so I do accept defense counsel's representation that she did say that she would have trouble with the credibility of a heavy drug user; however, there was no follow-up questions about — and especially, this is key in my analysis, is the State had questioned many individuals about how to assess the credibility of someone while testifying, and there was no follow-up questions of her at all about whether that was tied to whether someone was intoxicated at the time that they perceived an event and whether they can accurately relay . . . information that happened while they were intoxicated versus just a complete dislike for individuals that were heavy drug users. No follow-up questions were done on that issue as to her initial statement, and I do find, under GR 37, that an objective observer could view that the reason why this juror is being struck is due to her ethneticity (sic) so I am denying the challenge.

At trial, the State called several witnesses, including police officers who responded to the scene, several detectives, and forensic experts. Morgan's

---

[2] Black, Indigenous, and People of Color. Morgan is white.

roommate, Alexander Gonzalez, testified about his friendship with Morgan and his observations of the brief relationship between Morgan and Young in the days before her murder. He also told the jury that Morgan owned and regularly carried a gun. Morgan's father testified about the phone call he received from Morgan after 3:00 a.m. on January 14, 2021. And Seattle Police Detective George Abed testified that the firearm found in the center console of Morgan's car had "obliterated" serial numbers, making it illegal and untraceable.

Morgan also testified at trial. He told the jury that he met Young in early January 2021 when he "bumped into her" on the street. Eventually, at Young's request, he got her a hotel room for the night. The two got along well, and the next day, she started staying with Young and Gonzalez at their apartment. In the following days, Morgan and Young made a plan to meet a man Morgan did not know to pay off a debt she owed. They were to meet him at 1:00 a.m. on January 14, 2021. Morgan brought "a bigger bag" and "a couple of smaller bags" of methamphetamine[3] and his firearm to the meetup. He placed the gun in the center console of his car.

According to Morgan, the meetup did not happen until 2:00 a.m., south of "the Safeway on 22nd and Madison."[4] The unnamed man approached Morgan's car while Morgan stayed in the driver's seat and Young in the front passenger seat. The man stood outside Young's door and the two began insulting each

[3] Morgan testified that "the expectation was we were going to tender him about an ounce of methamphetamine, or possibly, then I was going to upsell him to maybe purchasing something else."

[4] The Safeway at 22nd Avenue E and E Madison Street is .3 miles from the Capitol Hill Trader Joe's.

6

other. Young then pulled out Morgan's gun from the center console, and the man reached in and grabbed it from her. He then walked around to the driver's side of the car, stuck the gun through the open window near where Morgan was sitting, and shot Young several times. Morgan wrestled the gun out of the man's hands, and he ran away.

Morgan told the jury he was scared to call the police because he thought he would "be in trouble" and "go to jail for a murder [he] did not do based on a legal technicality," so he "decided to cover it up." He drove to Seward Park and planned to "throw her body in the lake." But it was so muddy that he slipped and fell several times, so he left Young's body by the shore. Morgan explained that he took off her clothing because she had borrowed it from him and he did not want the police to trace the clothes back to him.

Morgan told the jury that he had bought his gun "months" before he met Young and knew it was missing its serial numbers. He said he bought it for its safety features, not because it was untraceable. Morgan also testified that around the time of the incident, he had been using drugs and alcohol in quantities "more than most people." He said he smoked only cannabis late in the day on January 13 and did not consume any drugs on the morning of January 14.

On cross-examination, the State asked Morgan about the police contacting him in his car on January 14. The prosecutor said, "You didn't tell [them it] was [Young]'s blood, right?" Morgan said, "No." The prosecutor

7

continued, "You didn't tell them where [Young] was at —," and defense counsel objected. After a sidebar, the court sustained the objection.

During its rebuttal, the State called toxicologist Brian Capron to testify about the drug content in Morgan's blood just after the incident. Capron explained that the toxicology results from Morgan's blood draw showed the presence of THC,[5] fentanyl, methamphetamine, and benzoylecgonine, the chemical released when the body breaks down cocaine. Capron also testified about how long those drugs may stay in the body and the general effect of the drugs on a person's judgment and behavior, including misperception and sedation. On cross-examination, Capron testified that Morgan's toxicology results showed usage "within a day, day and a half."[6]

The jury convicted Morgan of first degree murder and determined that he was armed with a firearm at the time. The court imposed a sentence of 360 months.

Morgan appeals.

ANALYSIS

Morgan argues (1) the trial court erred when it denied his peremptory challenge under GR 37, (2) it erred by admitting irrelevant prejudicial evidence, (3) the prosecutor improperly elicited testimony about and commented on

---

[5] Tetrahydrocannabinol.

[6] During its closing argument, the State told the jury that when officers arrived on the scene and asked, " 'What's going on with all that blood in the car,' " Morgan replied, " 'I don't know what's going on, sir.' " Defense counsel did not object. The State also repeatedly argued during closing that Morgan killed Young at Seward Park. Again, Morgan did not object.

8

Morgan's right to pre-arrest silence,[7] (4) insufficient evidence supports his murder conviction, and (5) cumulative error deprived him of his right to a fair trial. We address each argument in turn.

1. GR 37

Morgan argues that the trial court erred by denying his peremptory challenge to juror 82. We disagree.

We review a trial court's decision on a GR 37 motion de novo. *State v. Booth*, 22 Wn. App. 2d 565, 571, 510 P.3d 1025 (2022). The purpose of GR 37 is to eliminate the unfair exclusion of potential jurors based on race or ethnicity. GR 37(a). Under GR 37(c), a party or the court "may object to the use of a peremptory challenge to raise the issue of improper bias." "After an objection has been raised, the party exercising a peremptory challenge is required to articulate its reasons for doing so." *State v. Listoe*, 15 Wn. App. 2d 308, 319, 475 P.3d 534 (2020); GR 37(d). "The trial court then evaluates the reasons for exercising the challenge under the totality of the circumstances." *Listoe*, 15 Wn. App. 2d at 319; GR 37(e).

---

[7] Morgan also contends the prosecutor committed misconduct when he "argued facts not in evidence and elicited expert testimony that he later used for an improper purpose in closing argument." He points to the prosecutor's statements that Morgan drove Young "out to a secluded area, Seward Park, and killed her there." He also points to the prosecutor's improper reliance on toxicologist Capron's testimony "to argue that [the] downswing effects [of his drug use], including paranoia, misperception, and suspicion," was "motive" for Morgan to kill Young. But Morgan did not object to the prosecutor's statements below. While Morgan insists he did, the record shows his "objection" was to the State's attempt to introduce toxicology evidence, not to statements the prosecutor made to the jury. So, any error is waived absent misconduct so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). And Morgan fails to show that the prosecutor's statements were incurably flagrant and ill intentioned. Morgan waived these arguments.

If "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." GR 37(e). An "objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington." GR 37(f). The circumstances that the court should consider in evaluating a party's proffered race-neutral reasons include, "but are not limited to":

> (i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or types of questions about it;
> (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror . . . in contrast to other jurors;
> (iii) whether other prospective jurors provided similar answers but were not . . . challenge[d] . . . ;
> (iv) whether a reason might be disproportionately associated with a race or ethnicity; and
> (v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity.

GR 37(g). A proffered race-neutral reason for a peremptory strike must be specific and supported by the record. *See State v. Tesfasilasye*, 200 Wn.2d 345, 359-60, 518 P.3d 193 (2022) (race could be viewed as a factor where the record did not support State's claim that a dismissed juror—a Korean woman—"might be biased" because of her son's experience with the legal system, while the State did not challenge other jurors with similar experiences or "even jurors who were more equivocal in their assurances that they could be fair").

Here, the trial court objected to Morgan's peremptory challenge to juror 82 under GR 37 because the juror identified as "Hispanic/Latino." Morgan's attorney

then articulated the reasons for his challenge. He explained that juror 82 said she was not excited to be on the jury and, more importantly, that "she indicated she would have trouble giving credibility to anyone who is a drug user or uses drugs." So, if Morgan were to testify about his drug use, juror 82 would discount his credibility.

But Morgan did not question juror 82 about that concern. And several other jurors also revealed in their questionnaires that they had strong feelings about drug use that would make it difficult to be fair. Two of those jurors, 30 and 39, identified as "Caucasian" and ultimately sat on Morgan's jury. Morgan asked no questions of juror 30's disclosure. And he followed up with juror 39, eliciting that despite her strong opinions, she would be fair and impartial. From these circumstances, an objective observer could conclude that race was a factor in Morgan's use of a peremptory challenge to juror 82.

In any event, even if the court erred, any error was harmless. We analyze an erroneous denial of a peremptory challenge using the nonconstitutional harmless error standard. *Booth*, 22 Wn. App. 2d. at 584. Under this standard, an " 'error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " *Id.*[8] (quoting *State v. Aljaffar*, 198 Wn. App. 75, 86, 392 P.3d 1070 (2017)).

Morgan argues that any error is not harmless because juror 82 expressed "actual bias" toward heavy drug users and did not assert that she could set those biases aside. But Morgan did not challenge juror 82 for cause. And "[a] juror

---

[8] Internal quotation marks omitted.

who was not subject to a for-cause challenge is necessarily competent and unbiased." *State v. Hillman*, 24 Wn. App. 2d 185, 195, 519 P.3d 593 (2022) (citing *Booth*, 22 Wn. App. 2d at 584-85). So, any error was harmless.

2. Obliterated Serial Numbers

Morgan argues the trial court abused its discretion by admitting evidence that the serial numbers on his gun were "obliterated." We disagree.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.2d 1090 (2014). A court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). We will reverse an evidentiary ruling only if it results in prejudice. *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001). Again, an "error is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " *Id.* (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). Improperly admitted evidence is harmless if it is of minor significance in relation to the evidence as a whole. *Id.*

Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." ER 401. We presume that relevant evidence is admissible, and the party seeking its exclusion bears the burden of establishing unfair prejudice. *Carson v. Fine*, 123 Wn.2d 206, 224-25, 867 P.2d 610 (1994). Evidence is unfairly prejudicial if it is likely to elicit an

emotional response rather than a rational decision. *State v. Powell*, 126 Wn.2d 244, 264, 893 P.2d 615 (1995). Unfair prejudice is that caused by evidence of " 'scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.' " *Carson*, 123 Wn.2d at 223 (quoting *United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985)). We afford trial courts broad discretion "in balancing the probative value of evidence against its potential prejudicial impact." *State v. Coe*, 101 Wn.2d 772, 782, 684 P.2d 668 (1984).

Citing *State v. Mee*, 168 Wn. App. 144, 275 P.3d 1992 (2012), and *State v. McDaniel*, 155 Wn. App. 829, 230 P.3d 245 (2010), Morgan argues that evidence of the obliterated serial numbers was unduly prejudicial because it required the jury to speculate that he personally obliterated the numbers to render the gun untraceable. But these cases are inapposite.

In *Mee*, the trial court erroneously admitted evidence about the meaning of certain gang behaviors without any showing that the defendant engaged in those behaviors. 168 Wn. App. at 159. And in *McDaniel*, the trial court admitted evidence of flight when the defendant was not the driver of the fleeing car. 155 Wn. App. at 838. Division Two concluded this was error because the evidence of the police chase and arrest was more prejudicial than probative, as "nothing demonstrated the [the defendant]'s flight was volitional." *Id.* at 855.

This case is not like *Mee* or *McDaniel*. Here, the relevance of the evidence flows from Morgan's knowledge that the gun had obliterated serial numbers, rendering it untraceable, not whether Morgan personally obliterated

13

them. And Morgan testified that he purchased the gun knowing that it had no serial numbers.

The trial court did not err by admitting evidence that the serial numbers on Morgan's gun were obliterated.[9]

3. Violation of Right to Pre-Arrest Silence

Morgan argues the prosecutor improperly elicited testimony about and then commented on his right to pre-arrest silence. The State argues that Morgan waived this argument because he did not object at trial and has not shown manifest constitutional error. We agree with the State.

Generally, we do not consider unpreserved errors raised for the first time on appeal. State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007) (citing RAP 2.5(a)). This is because a party's failure to object deprives the trial court of an opportunity to prevent or correct the error. Id. at 935. Still, we may review the alleged error if the appellant shows it is manifest constitutional error. Id. at 926-27; RAP 2.5(a)(3). To establish manifest constitutional error, an appellant must "identify a constitutional error and show how, in the context of the trial, the alleged error actually affected [their] rights." State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

Here, Morgan argues that the prosecutor improperly elicited testimony about his pre-arrest silence during cross-examination. Specifically, he points to

---

[9] Morgan's attorney also used failure to investigate as a general theme throughout cross-examination and his closing argument. He argued the police had "made up" their minds that Morgan was guilty and decided not to investigate the evidence. But the police did not investigate the history of the gun because the missing serial numbers made it untraceable. So, the evidence was also admissible to rebut Morgan's argument that the police botched the investigation.

the prosecutor's questions to Morgan about whether he told police that the blood in his car belonged to Young. And then he points to the prosecutor's comments on that testimony in closing argument. But Morgan did not object to the question on cross-examination or to the prosecutor's argument in closing. And he makes no attempt to show manifest constitutional error. So, he waived his argument that the State violated his right to pre-arrest silence.[10]

4. Sufficiency of the Evidence

Morgan argues that his first degree murder conviction is not supported by sufficient evidence of premeditation. We disagree.

We review de novo the sufficiency of the evidence. *State v. Hummel*, 196 Wn. App. 329, 352, 383 P.3d 592 (2016). To determine whether sufficient evidence supports a conviction, we view the evidence in a light most favorable to the prosecution and consider whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. DeJesus*, 7 Wn. App. 2d 849, 882, 436 P.3d 834 (2019). A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences made from it. *State v. Fedorov*, 181 Wn. App. 187, 193-94, 324 P.3d 784 (2014).

We defer to the fact finder on issues involving conflicting testimony, witness credibility, and the persuasiveness of the evidence. *DeJesus*, 7 Wn. App. 2d at 883. Circumstantial evidence and direct evidence are equally reliable

---

[10] Morgan also argues Seattle Police Detective Alan Cruise commented on his pre-arrest silence during Detective Cruise's testimony on rebuttal. But the record shows that Detective Cruise testified about information the police learned after hearing Morgan's testimony at trial. Detective Cruise made no reference to Morgan's pre-arrest silence.

in determining the sufficiency of evidence. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). But "inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

The element of premeditation differentiates first degree murder from second degree murder. *State v. Bingham*, 105 Wn.2d 820, 823, 719 P.2d 109 (1986). Premeditation requires "more than a moment in point of time." RCW 9A.32.020(1). The State must show "the deliberate formation of and reflection upon the intent to take a human life" by "thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991).

The State may prove premeditation by circumstantial evidence where the jury's inferences are reasonable and its verdict is supported by substantial evidence. *State v. Pirtle*, 127 Wn.2d 628, 643, 909 P.2d 245 (1995). While the defendant's mere opportunity to deliberate cannot by itself support a finding of premeditation, a wide range of facts can support the inference of premeditation. *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999). There are four characteristics particularly relevant to establishing premeditation—"motive, procurement of a weapon, stealth, and the method of killing." *DeJesus*, 7 Wn. App. 2d at 883. Circumstantial evidence that the defendant brought a weapon to the scene and fired multiple shots supports a reasonable inference of premeditation. *State v. Barajas*, 143 Wn. App. 24, 36, 177 P.3d 106 (2007).

Here, the trial court instructed the jury that to convict Morgan of first degree murder, the State had to prove beyond a reasonable doubt that he "acted with intent to cause the death of Autumn Young" and that "the intent to cause the death was premeditated." It instructed the jury that "[a] person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." And, consistent with controlling case law, it instructed the jury that "premeditated" means

> thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.[11]

Viewing the evidence in a light most favorable to the State, a rational trier of fact could conclude that Morgan premeditated Young's murder by using stealth, bringing a weapon to the scene, and firing multiple shots. Cell phone records showed that Morgan took Young to a remote area before he went to Capitol Hill. He travelled from north Seattle to Seward Park and remained there for around 12 minutes—longer than he was at any other spot during the relevant time frame. Morgan brought his gun with obliterated serial numbers and his passport. Morgan's car had no license plates, and the temporary license plate had been removed from the rear window and stashed under a car seat. Finally, Morgan brought his gun and used it to shoot Young five times at close range in

---

[11] The court also instructed the jury on the lesser-included crime of second degree murder, which does not include the element of premeditation.

17

the side of her head. The evidence showed that all the bullets travelled from left to right and that a pool of Young's blood was in Morgan's front passenger seat.

Still, Morgan argues his case is "virtually indistinguishable" from *Austin* v. *United States*, 382 F.2d 129 (D.C. Cir. 1967), *abrogated in part on other grounds by United States v. Foster*, 783 F.2d 1082 (D.C. Cir. 1986). We disagree.

In *Austin*, the defendant and the victim were seen together at an after-hours establishment before driving off together in the defendant's truck around 4:30 a.m. 382 F.2d at 132. "The Government produced no witness as to what happened" after. *Id.* But at around 5:00 a.m., police saw the defendant near the victim, who was nearly deceased with 26 stab wounds. *Id.* A jury convicted the defendant of first degree murder, and he appealed. *Id.* at 131.

The circuit court held that "the Government's evidence was insufficient to warrant submission to the jury of the issue of premeditation." *Austin*, 382 F.2d at 138. The court reasoned that the defendant's use of a knife to accomplish the murder was not probative of premeditation because he carried it "as a matter of course." *Id.* at 139. And the violence and multiple wounds "standing alone" cannot support premeditation. *Id.* Further, the defendant's "ample time [between 4:30 and 5:00 a.m.] to premeditate and deliberate is not evidence" that he actually premeditated his intent to kill. *Id.* And finally, the prosecution did not show any motive for the crime. *Id.* The court concluded that "the jury could only speculate and surmise, without any basis in the testimony or evidence, that appellant acted with premeditation." *Id.*

18

This case is different from *Austin*. The jury here was not left to speculate about premeditation. And the jury found Morgan's version of events not credible. As discussed above, affirmative evidence supported the jury's conclusion that Morgan acted with premeditation.

5. Cumulative Error

Morgan contends he is entitled to a new trial because the cumulative effect of all his asserted errors denied him a fair trial. We disagree.

Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair. *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (3012). Cumulative error "is limited to instances where there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Morgan shows no prejudicial error, so he is not entitled to a new trial based on cumulative error.

Because the trial court did not abuse its discretion and Morgan shows no prejudicial error, we affirm his conviction and sentence.

_____, ACJ

WE CONCUR:

_____          _____
Bui, J.                           Birk, J.

19