# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57721-6-II |
| Respondent, | |
| v. | |
| RAY CASTILLO, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, P.J. — Ray Castillo appeals a conviction for second degree assault following a jury trial. Specifically, Castillo argues that the trial court violated his right to present a defense when it excluded evidence of a false reporting citation and violated the confrontation clause when it admitted out of court testimonial statements. Additionally, Castillo argues the trial court erred when it imposed discretionary legal financial obligations (LFOs) on him when he is indigent.

Because evidence of the false reporting citation was not relevant or probative and because it did not constitute Castillo's entire defense, the trial court did not violate Castillo's right to present a defense when it excluded evidence of the citation. And because the victim's statements to the officer on the scene were nontestimonial and any erroneous admission of the victim's statements to the nurse examiner was harmless error, there was no violation of the confrontation clause. Finally, because Castillo is indigent and his case is not yet final, imposing discretionary LFOs is improper. Accordingly, we affirm Castillo's conviction, but we reverse the discretionary LFOs and remand for the trial court to strike the imposed discretionary LFOs.

No. 57721-6-II

FACTS

A.    BACKGROUND

On January 6, 2019, Officer Brent Donaldson was on patrol. Officer Donaldson made a traffic stop and pulled into an apartment complex that provided housing for formerly homeless individuals. As he approached the driver of the vehicle he had pulled over, two women, Barbara Jordan and Jasmine Hammond, ran up to Officer Donaldson, yelling that Jordan had been assaulted by her boyfriend, who they identified as Castillo.

It seems Jordan had called 911 after being assaulted, but before Officer Donaldson arrived at the apartment complex. As Jordan called 911, Officer Donaldson happened to pull over a vehicle for a traffic infraction in the apartment complex parking lot. The 911 operator instructed Jordan to flag down Officer Donaldson.

The 911 call proceeded as follows:

> OPERATOR: 911. How can I help you?
> [JORDAN]: Hello.
> OPERATOR: 911.
> [JORDAN]: I need an officer here. I need an officer here at my work where I was just assaulted. Please, please, please, please.
> OPERATOR: (Indiscernible) apartment?
> [JORDAN]: (Indiscernible). There's a cop right there. Yeah. There he is right there.
> OPERATOR: Okay. Waive [sic] him down. Stay on the line [un]til he sees you though. I want to make sure he gets to you.
> [JORDAN]: Officer. Officer. Officer. Wait. Officer. Officer. Officer. Please, please, officer. Officer, (indiscernible), please. He's right—he's right there. (Indiscernible).
> OPERATOR: Did he—did he see you? Are they with you?
> [JORDAN]: (Indiscernible).
> OPERATOR: Are they out with you? Ma'am? Can you hear me?
> [JORDAN]: (Indiscernible).

2

1 Verbatim Rep. of Proc. (VRP) (Oct. 17, 2022) at 235-36. As soon as Castillo saw Officer Donaldson's vehicle, he began to run.

Both Jordan and Hammond tried to direct Officer Donaldson's attention to Castillo, who was running away from the apartment complex. According to Officer Donaldson, it was "a very chaotic scene." 1 VRP (Oct. 18, 2022) at 407. Officer Donaldson attempted to radio additional police units to assist while watching Castillo "running across the open field . . . and behind [a] bank" and with Jordan and Hammond "talking over each other." 1 VRP (Oct. 18, 2022) at 407. Officer Donaldson released the driver he had pulled over.

Jordan was upset, crying, talking rapidly, and then "fell to her knees and complained of pain to her right shoulder and neck." Clerk's Papers (CP) at 44. Officer Donaldson requested paramedics respond to the scene. Jordan told Officer Donaldson that she and Castillo had an argument inside one of the apartments at the complex. Jordan had accused Castillo of impregnating another woman. The woman Jordan accused Castillo of impregnating was Hammond.

Officer Donaldson then asked Hammond to step away so he could continue questioning Jordan. Jordan told Officer Donaldson that she was homeless and usually slept behind the apartment complex; however, Castillo, who was also homeless, had friends who lived at the complex that they would visit when the weather was cold. After arguing with Castillo in the apartment, Jordan went outside and ran into Hammond, who was homeless as well.

Jordan told Officer Donaldson that while Jordan and Hammond talked, Castillo allegedly also came outside, stepped on Jordan's foot, "grabbed her around the neck, upper torso area, [and] squeezed." 1 VRP (Oct. 18, 2022) at 409. Jordan told Officer Donaldson that "it interfered with

her ability to breathe." 1 VRP (Oct. 18, 2022) at 409. Castillo then threw Jordan on the ground, and Jordan had blurry vision, difficulty breathing, and a sore throat. Officer Donaldson spoke with Jordan for no more than "a few minutes." 1 VRP (Oct. 18, 2022) at 418.

Officer Donaldson then spoke with Hammond. Hammond denied being pregnant and told Officer Donaldson that she witnessed Castillo walk up to Jordan, "grab her by the neck in 'a choke hold,'" and throw her to the ground. CP at 44. Hammond also told Officer Donaldson that Jordan remained on the ground for approximately five minutes while Castillo yelled and threw food at Jordan. Officer Donaldson had noted a "raw meat odor" around Jordan when he interviewed her. 1 VRP (Oct. 18, 2022) at 417.

After Officer Donaldson finished speaking with Hammond, he returned to Jordan, who was being attended to by the paramedics. The paramedics took Jordan to the emergency room (ER), and Officer Donaldson followed. At the hospital, Officer Donaldson completed paperwork while Jordan was treated by an ER physician, Dr. Christopher Burke.

Jordan reported to Dr. Burke that she had been "choked" and "complained of left sided neck pain." 1 VRP (Oct. 18, 2022) at 338. Dr. Burke discussed his concerns with Jordan regarding possible injuries as a result of the strangulation and conducted "the standard evaluation to be a series of labs followed by a CT angiogram[1] of [Jordan's] neck." 1 VRP (Oct. 18, 2022) at 339. Dr. Burke ordered the CT scan to evaluate for potential internal injuries to Jordan's neck.

---

[1] CT stands for "computed tomography." *CT Angiography (CTA)*, RADIOLOGYINFO.ORG, https://www.radiologyinfo.org/en/info/angioct (last visited Oct. 18, 2024). A CT angiogram is a type of CT scan that "uses an injection of contrast material into . . . blood vessels and CT scanning to help diagnose and evaluate blood vessel disease or related conditions." *CT Angiography (CTA)*, RADIOLOGYINFO.ORG, https://www.radiologyinfo.org/en/info/angioct (last visited Oct. 18, 2024).

Following Dr. Burke's examination and as Officer Donaldson prepared to leave the hospital, Dr. Burke told Officer Donaldson that Jordan also wished to report that Castillo had sexually assaulted her earlier that same day.

Officer Donaldson informed Jordan that another officer would come take her statement regarding the alleged sexual assault. Officer Jason Nicholson arrived at the hospital to take Jordan's statement. Jordan told Officer Nicholson that she and Castillo had been in the apartment of one of Castillo's friends, Tony Jackson, a resident at the apartment complex. Jordan asked to use Jackson's shower, which Jackson allowed. Jackson informed Castillo that Jordan was at his apartment.

Jordan told Officer Nicholson that Castillo arrived and prevented her from showering. Jordan then provided different accounts of what occurred, but generally stated to Officer Nicholson that Castillo penetrated her vaginally and forced oral sex. Jordan agreed to complete a sexual assault forensic exam with a sexual assault nurse examiner (SANE). Jordan also told Officer Nicholson that she wanted Castillo to go to jail and asked several times whether Castillo was in custody.

Marissa Skidmore, a registered nurse and a SANE, was called to perform a sexual assault examination on Jordan. In addition to Skidmore and Jordan, a Young Women's Christian Association (YWCA) advocate was present in the exam room. During the exam, Jordan identified Castillo as her assailant. Jordan also complained of a headache and neck pain and mentioned to Skidmore that "there were witnesses who saw [Castillo] with his arm around [Jordan's] neck." 1 VRP (Oct. 18, 2022) at 354. Skidmore did not see physical injuries to Jordan's neck at the time of the exam.

After Skidmore finished collecting evidence from Jordan, Jordan was taken for the CT scan that had been ordered by Dr. Burke. Jordan had an allergic reaction to the intravenous contrast dye used to facilitate vascular imaging and ultimately had to be intubated. As a result, Skidmore was unable to complete discharge planning with Jordan.

B. PROCEDURAL HISTORY

The State charged Castillo with second degree assault-domestic violence (DV) for allegedly strangling Jordan. The State subsequently filed an amended information, which added a charge of second degree rape-DV against Castillo in addition to the assault charge. A jury trial was set for October 2022.

1. False Reporting Citation

In January 2020, Jordan received a citation for allegedly violating RCW 9A.84.040[2] by making a false police report. Jordan[3] had called 911 claiming that a man had attempted to kidnap her by trying to pull her into his car. She was able to escape by pepper spraying the man.

_____

[2] RCW 9A.84.040 states in part:

> A person commits false reporting if, with knowledge that the information reported, conveyed, or circulated is false, he or she initiates or circulates a false report or warning of an alleged occurrence or impending occurrence knowing that such false report is likely to cause: Evacuation of a building, place of assembly, or transportation facility; public inconvenience or alarm; or an emergency response.

RCW 9A.84.040(1).

[3] The citation references "Barbara Campos." CP at 52. However, the parties agree that Barbara Campos and Barbara Jordan are the same person.

Police detained the alleged kidnapper, a man named Edgar Montes. When the police contacted Montes, he was missing a shoe, wore a wet jacket "as if it had been sprayed with something," and his forehead was bleeding. CP at 52. Montes explained that he was acquainted with Jordan, they would often meet up for sexual favors, and he would give her money in return because "they [were] friends." CP at 52. Jordan had texted Montes asking for assistance to pay her cell phone bill, and Montes agreed to meet up.

Montes drove to Jordan's residence, and Jordan got into the front passenger seat of Montes's car. Jordan immediately began asking for money, but Montes declined, asking for sexual favors first. Jordan then asked for $20 to purchase some drinks. Montes agreed, and Jordan exited the vehicle. However, Montes suspected that Jordan did not intend to return, so he also exited his car. At that moment, Jordan pepper sprayed him and started screaming for help. Almost immediately, a man with "a large military style knife" arrived and began attacking Montes. CP at 53. The man punched Montes in the face and cut his forehead with the knife.

Montes was scared the man would kill him, so he ran away and attempted to call the police. The police noted that prior to Jordan's kidnapping call, there had been an incoming call from Montes's phone that had been disconnected. After the police questioned Jordan, they determined that the man with the knife was actually Jordan's boyfriend, and Jordan provided several inconsistent accounts of the circumstances under which she met Montes. As a result, the police placed Jordan in custody, and the State charged her with false reporting.[4]

---

[4] The charging document is not part of the appellate record.

Jordan was then released with an arraignment date, but she failed to appear. The trial court issued a bench warrant. However, approximately a week later, the State dismissed the false reporting charge against Jordan. The record does not show why the State dismissed the charge other than passing references to the fact that "Jordan was being prostituted" and there "was further evidence showing that [Jordan] was actually the victim of a crime." 1 VRP (Oct. 18, 2022) at 366.

Jordan also had two theft charges filed against her, and she also failed to appear in each of those cases. Jordan has been on active warrant status since December 2020.

2. Motions in Limine

Between the time of Castillo's alleged assaults against Jordan and trial, neither Jordan nor Hammond had "availed themselves to any interviews," nor did the State anticipate that Jordan or Hammond would appear to testify. CP at 32. The parties filed pretrial motions regarding the admission or exclusion of certain evidence.

a. False reporting citation

The State sought to exclude evidence of any prior bad acts or character evidence of any State witness without an offer of proof. Castillo objected to the extent it would exclude evidence of Jordan's false reporting citation. Castillo wanted to offer the false reporting citation to impeach Jordan's credibility, arguing that it was admissible as a prior bad act under ER 404(b).[5] The State argued that the citation was not a conviction, Jordan was not available to rebut evidence of the

---

[5] ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

citation, and the "fact that someone is . . . investigated for a crime, has no bearing, truly, on their credibility." 1 VRP (Oct. 18, 2022) at 366.

The trial court granted the State's request to exclude evidence of the false reporting citation. The trial court stated:

> If we're talking about the use of a probable cause statement, we're talking about [a] document and information regarding allegations where someone is presumed to be innocent of whatever those particular allegations are. The fact that there were allegations in some other case and even if they included allegations of false reporting in another case, I don't see where that becomes relevant for purposes of the evaluation in this case. Even under Evidence Rule 609 there are particular standards and limitations that are followed, even when a conviction has taken place to allow those to be presented for impeachment purposes. We've got an effort apparently to impeach for a non-testifying witness that I think creates challenges to use this document in that potential way as well. And, I don't think Evidence Rule 404(b) gets to the use of that document either and the information presented in it, for a variety of reasons. Under 404(b) I don't know how I could be making a finding for a preponderance of evidence that particular misconduct would have occurred. I also think under a 404(b) analysis or a 609 analysis or straight up 403 analysis, there's got to be consideration about the weight and the probative value, as it connects to the issue of a prejudicial effect.
>
> And here, I think that the prejudicial effect would outweigh whatever very limited probative value there would be from an allegation of conduct in a different circumstance involving this same particular non-testifying person. So, for those reasons, I would grant the request from the State to exclude use or reference of that probable cause statement.

1 VRP (Oct. 18, 2022) at 368-69.

b.     Statements to Officer Donaldson

The State moved to admit Jordan's statements to Officer Donaldson upon her immediately contacting him as excited utterances under ER 803(a)(2). Castillo agreed that Jordan's initial statements to Officer Donaldson fell within a hearsay exception, whether they constituted excited

utterances or present sense impressions. However, Castillo raised concerns about violation of the confrontation clause and whether an ongoing emergency existed after Officer Donaldson's arrival.

Following an offer of proof from Officer Donaldson, the trial court found that Jordan's initial statements to Officer Donaldson fell within the excited utterance hearsay exception. Additionally, the trial court found that the statements did not violate the confrontation clause. The trial court stated:

> I do find that the primary purpose was for an ongoing emergency. Certainly, when asked, Officer Donaldson specifically said he viewed as an ongoing emergency up until the time the paramedics arrived. But that's not dispositive of the issues certainly. I do find that the circumstances support that conclusion. Some of the same reasons why there was an excited utterance. This was an event that . . . did not take place from a call that [Officer Donaldson] was even sent there to investigate. It's done at the same time as the 911 call is being handled by Ms. Jordan. [Officer Donaldson] is in this unusual situation of having pulled over a different driver while he was on duty. And then, there's an immediate[,] spontaneous event taking place.
>
> He was not dispatched there as I noted. All of those factors indicate this ongoing emergency in light of what the two wom[e]n are exchanging and wanting to reach out and concern[ed] with getting his attention, as well as what happens with Mr. Castillo as he's leaving the scene. The concern with safety of them that are involved at that location. And that that concern goes on during the time of this initial conversation between [Officer Donaldson] and Ms. Jordan.
>
> So, I find that the confrontation clause does not preclude the statement to be provided either. So, that would include the statements that Ms. Jordan would have provided to Officer Donaldson in the parking lot at that time.
>
> Basically, says [sic] within that three minutes period of time and that information that was obtained. That would include . . . any statements that were made regarding the cause of this alleged fight and altercation that had taken place as well.

1 VRP (Oct. 18, 2022) at 398-400.

c.      Statements to Skidmore

The State moved to admit Jordan's statements to Skidmore as nontestimonial statements that would be admissible at trial. Specifically, the State wanted to admit Jordan's statements to Skidmore regarding "[w]ho the perpetrator was. The way which [Jordan] was assaulted specifically. Any statements with whether she was injured. Details about the event where she was." 1 VRP (Oct. 17, 2022) at 191. Castillo objected on the basis that not all statements Jordan made to Skidmore were necessarily nontestimonial. The trial court reserved pending an offer of proof regarding Skidmore's testimony.

During the offer of proof, Skidmore testified that it was relevant for her as a SANE to know the identity of a perpetrator in order to assist with safety issues at discharge. Additionally, Skidmore stated that her strangulation assessment of Jordan and Jordan's description of the strangulation were important in directing her treatment. Specifically, Skidmore stated:

> Strangulation is a very, very serious injury and can cause long term health effects. And so, this is important, not only for me to help with discharge planning. Because, some of the effects of strangulation don't occur until after discharge. So, it might help me educate the patient for what to do once they are discharged. But then, I also go and have a discussion with the physician and we have a discussion about whether or not we need to do any follow up testing.

1 VRP (Oct. 18, 2022) at 294. Skidmore further stated that Jordan's complaints of neck pain and headache guided Skidmore's treatment.

The State again argued that Jordan's statements to Skidmore constituted nontestimonial statements that fell within hearsay exceptions. Castillo argued that Jordan's statements to Skidmore were testimonial because Skidmore's primary function was to collect evidence and Skidmore ultimately provided only limited medical treatment.

11

The trial court ruled that Jordan's statements to Skidmore fell within the hearsay exception under ER 803(a)(4),[6] and for confrontation clause issues, the primary purpose of Jordan's statements to Skidmore was not to create out-of-court testimony:

> The issue then as far as whether or not a confrontation clause issue is impacted on the scope of the testimony she can provide. Looking at that primary purpose and need for it. Whether or not the information was obtained to create an out of court substitute for trial testimony.
>
> . . . To me, within the totality of the evidence that [Skidmore] presented and the reason why she was present, the focus on the need for that additional medical examination is something that's offered to the patient, Ms. Jordan, at this point. That the information is collected within the scope of additional treatment that could be provided, treatment beyond what Dr. Burke said he would be able to provide himself, as an ER physician. I find that that is a primary purpose then was not to create an out of court substitute for trial testimony. There was no[t] anyone present from the law enforcement area. And, while some of the information was subsequently utilized as part of perhaps additional testing or valuation or exploring issues as it relates ultimately to law enforcement's involvement.
>
> [Skidmore's] primary purpose, overall, was focused on the gathering of treatment, providing recommendations, as it related to [Jordan's] physical conditions and circumstances at the time.
>
> As far as the information identified with the alleged perpetrator. . . . [Skidmore] identifies that the need for the identification is specifically needed and important for the safety of the person being treated, to gather information around that individual for recommendation for additional medical treatment that could be

---

[6] ER 803(a)(4) provides:

> The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> . . . Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

necessary depending on that individual. . . . I find that that identification is also within the area of information that is non-testimonial.

1 VRP (Oct. 18, 2022) at 321-23.

3.  Trial

a.  Jackson's testimony

The State called Jackson as a witness. Jackson stated that he has known Castillo since childhood, but he had only met Jordan once. Jackson testified that when he lived at the apartment complex, he ran into Jordan. Jordan was distraught and wet from an ongoing "electrical storm" at the time. 1 VRP (Oct. 17, 2022) at 242.

Jackson learned that Jordan was dating Castillo, and he invited her back to his apartment so he could assist her with locating Castillo. Jackson offered for Jordan to get into his bed and warm up under the blankets, and Jordan did so. Jackson then left his apartment and encountered Castillo at the apartment complex. Jackson told Castillo that Jordan was in his apartment, and the two men returned. Castillo and Jordan then began to argue, and Jackson asked them to leave.

b.  Dr. Christopher Burke's testimony

Dr. Burke also testified. Dr. Burke conducted a physical exam of Jordan and noted a "mild abrasion to [Jordan]'s left neck." 1 VRP (Oct. 18, 2022) at 338. Dr. Burke testified that Jordan complained of left-sided neck pain and reported that she had been "choked." 1 VRP (Oct. 18, 2022) at 338.

Dr. Burke discussed with Jordan his concern for potential injuries and based on Jordan's complaints, recommended "a series of labs followed by a CT angiogram of her neck." 1 VRP (Oct. 18, 2022) at 339. Dr. Burke testified that the purpose of the CT scan was "to use intravenous

contrast to evaluate for any potential vascular injuries in [Jordan's] neck." 1 VRP (Oct. 18, 2022) at 339. Ultimately, Jordan's CT scan did not indicate any deeper traumatic injuries; however, Dr. Burke also testified that just because Jordan did not have deeper injuries did not mean that "strangulation did not occur." 1 VRP (Oct. 18, 2022) at 339.

    c.  Castillo's testimony

Castillo testified in his own defense. According to Castillo, he was at the apartment complex to visit a friend and happened to run into Jackson. Castillo learned from Jackson that Jordan was in Jackson's apartment. Castillo had not planned to meet with Jordan at the apartment complex.

Castillo went to Jackson's apartment and found Jordan in Jackson's bed. Castillo became angry because he thought Jordan "was sleeping around." 2 VRP (Oct. 19, 2022) at 525. Castillo and Jordan began to argue, and Jackson kicked them out of the apartment. Castillo and Jordan then stayed the night with a different friend in the same apartment complex.

On a different day,[7] Castillo was standing outside the apartment complex. Someone had told Castillo that Jordan was looking for him. Castillo had "a package of Bratwursts and some gizzards." 2 VRP (Oct. 19, 2022) at 527. Jordan and "a blonde girl, a friend of hers," who turned out to be Hammond, approached Castillo. 2 VRP (Oct. 19, 2022) at 527. According to Castillo, he had only met Hammond a couple days before and this was the second time he had ever seen her.

---

[7] Castillo's testimony is not clear whether the following events occurred the next day or if several days passed between the incidents at the apartment complex.

Jordan confronted Castillo about Hammond allegedly being impregnated by Castillo. Castillo did not wish to argue, so he began to walk away. Jordan accused Castillo of walking away because he was "guilty and [he did not] want to face the problem that [Hammond was] pregnant." 2 VRP (Oct. 19, 2022) at 536. Castillo became upset, opened the package of bratwursts, and threw some of them at Jordan. One of the bratwursts struck Jordan in the head. Castillo then continued to walk away.

As he walked away, Castillo noticed an officer pulling over a vehicle at the apartment complex. Castillo began to run because he was scared of the police and began running before Jordan called 911.

### d. Jury question and verdict

The jury was instructed on second degree assault. Specifically, instruction 6 stated: "A person commits the crime of assault in the second degree when he or she assaults another by strangulation." CP at 67. Instruction 10 provided the definition of strangulation: "'Strangulation' means to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." CP at 71.

The jury found Castillo guilty of second degree assault.[8] Castillo was sentenced to 366 days of confinement. The trial court also found that Castillo was indigent and entered an order of indigency. The trial court then imposed a $500 crime victim penalty assessment (CVPA), a $100 DV assessment and a $250 "[j]ury demand fee." CP at 90.

---

[8] The jury acquitted Castillo of the second degree rape charge.

15

Castillo appeals.

ANALYSIS

Castillo's appeal challenges the trial court's exclusion of Jordan's false reporting citation, the trial court's admission of Jordan's statements to Officer Donaldson and Skidmore, and the trial court's imposition of discretionary LFOs when he was indigent.

A.      RIGHT TO PRESENT A DEFENSE

Castillo argues that the trial court's exclusion of Jordan's false reporting citation prevented him from impeaching Jordan's credibility, thereby violating his right to present a defense. Specifically, Castillo asserts that the false reporting citation was highly probative because it showed Jordan's "willingness to lie to police," which was "critical to his ability to challenge the credibility of [Jordan's] claims against him." Br. of Appellant at 26. We disagree.

1.      Legal Principles

A criminal defendant has a constitutional right to present a defense. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022). However, the right is not absolute. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).

Washington courts employ a two-step test to determine whether a court's evidentiary decision violates a defendant's right to present a defense. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019), *cert. denied*, 142 S. Ct. 726 (2021). First, courts review the evidentiary ruling for abuse of discretion. *Jennings*, 199 Wn.2d at 59. Evidence must be relevant and admissible, and "[a] trial court abuses its discretion if 'no reasonable person would take the view adopted by the trial court.'" *Id.* (internal quotation marks omitted) (quoting *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)); ER 401, 402. "'Relevant credibility evidence may include

specific instances of lying.'" *State v. Bartch*, 28 Wn. App. 2d 564, 580, 537 P.3d 1091 (2023) (quoting *State v. Lee*, 188 Wn.2d 473, 488, 396 P.3d 316 (2017)) , *review denied*, 2 Wn.3d 1026 (2024). Nonetheless, "evidence of a witness' prior false statement is not always relevant, particularly when that evidence is unrelated to the issues in the case." *Lee*, 188 Wn.2d at 489.

If the trial court abuses its discretion and prejudice results from the evidentiary ruling, the analysis ends. *State v. Broussard*, 25 Wn. App. 2d 781, 786-87, 525 P.3d 615 (2023). "However, if the ruling was either within the trial court's discretion or an abuse of discretion but harmless, the review proceeds to step two, reaching the constitutional question." *Id.*

Courts review de novo "whether the exclusion of evidence violated the defendant's constitutional right to present a defense." *Bartch*, 28 Wn. App. 2d at 590; *accord Arndt*, 194 Wn.2d at 797-98. Generally, "'the State's interest in excluding evidence must be balanced against the defendant's need for the information sought to be admitted.'" *Jennings*, 199 Wn.2d at 65 (quoting *Arndt*, 194 Wn.2d at 812). Courts will consider whether the evidence excluded constituted a defendant's entire defense and whether the evidence had high probative value. *Arndt*, 194 Wn.2d at 812-13.

The right to present a defense also includes the right to confront and cross-examine adverse witnesses. *State v. Orn*, 197 Wn.2d 343, 352, 482 P.3d 913 (2021). Courts have found a constitutional violation in exclusion of evidence of a witness's bias. *Id.* A witness's bias is always relevant and "'the more essential the witness is to the prosecution's case, the more latitude the defense should be given to explore fundamental elements such as motive, bias, [or] credibility.'" *Id.* at 354 (alteration in original) (quoting *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189

(2002)). Such evidence is more than an attack on a witness's general credibility; it can demonstrate a witness's motivation in testifying. *Id.* at 354.

Violation of the right to present a defense is "subject to constitutional harmless error review." *Id.* at 359. Under this standard, the State must establish that the error was harmless beyond a reasonable doubt. *State v. Burke*, 196 Wn.2d 712, 739, 478 P.3d 1096, *cert. denied*, 142 S. Ct. 182 (2021). "The error is harmless '[i]f the untainted evidence is so overwhelming that it necessarily leads to a finding of the defendant's guilt.'" *Id.* (alteration in original) (quoting *State v. Koslowski*, 166 Wn.2d 409, 431, 209 P.3d 479 (2009)).

> Specific instances of a witness's conduct
>
> for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

ER 608(b). Additionally, "[w]hen a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." ER 806.[9]

---

[9] ER 806 further provides:

> Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross examination.

2.      No Violation of Right to Present Defense

Castillo argues that the trial court's exclusion of Jordan's false reporting citation deprived

him of his right to present a defense.  Specifically, Castillo asserts that evidence of the citation was

probative of Jordan's credibility and "critical to his ability to challenge the credibility of her claims

against him."  Br. of Appellant at 26.  The State argues that the trial court properly excluded the

false reporting citation and there was no violation of Castillo's right to present a defense.  We

agree with the State.

a.      Trial court did not abuse its discretion in excluding the evidence

We first review whether the trial court abused its discretion when it excluded evidence of

Jordan's false reporting citation.  *Jennings*, 199 Wn.2d at 59.  Here, in the trial court, Castillo

attempted to have the citation admitted under 404(b) as a prior bad act.[10]  The trial court declined

to do so and explained its reasoning:

> If we're talking about the use of a probable cause statement, we're talking about
> document and information regarding allegations where someone is presumed to be
> innocent of whatever those particular allegations are.  The fact that there were
> allegations in some other case and even if they included allegations of false
> reporting in another case, I don't see where that becomes relevant for purposes of
> the evaluation in this case. . . .  Under 404(b) I don't know how I could be making

---

[10] On appeal, Castillo abandons his argument of the citation's admissibility under ER 404(b).
Instead, he argues that evidence of the citation was admissible under ER 806 and ER 608(b)
because it was probative of Jordan's lack of credibility and relevant credibility evidence includes
specific instances of lying.  The State cites to RAP 2.5 and asserts that Castillo has waived his
claim on appeal because he did not argue ER 806 or 608(b) to the trial court.

RAP 2.5(a)(3) provides that a party may raise an error for the first time on appeal if it is a
manifest error affecting a constitutional right.  While Castillo did not specifically argue ER 806 or
ER 608(b) to the trial court, Castillo still argued that evidence of the citation was relevant and
admissible and made a record objecting to exclusion of the citation.  Moreover, Castillo claims
that exclusion of the citation violated his constitutional right to present a defense.  Therefore, we
address Castillo's claim in its entirety.

a finding for a preponderance of evidence that particular misconduct would have occurred. I also think under a 404(b) analysis . . . or straight up 403 analysis, there's got to be consideration about the weight and the probative value, as it connects to the issue of a prejudicial effect.

And here, I think that the prejudicial effect would outweigh whatever very limited probative value there would be from an allegation of conduct in a different circumstance involving this same particular non-testifying person. So, for those reasons, I would grant the request from the State to exclude use or reference of that probable cause statement.

1 VRP (Oct. 18, 2022) at 368-69.

The trial court's reasoning shows that it excluded the citation based on ER 403. ER 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

The record supports the trial court's reasoning. The record shows that Jordan was never convicted of false reporting, and indeed, the State dismissed the charge. As the trial court pointed out, the citation constituted an *allegation*, so whether Jordan made a false statement was never proven. Even if the citation contained proven facts, the circumstances that led to the citation occurred a year after the incident with Castillo; did not involve Castillo, Hammond, or any of the same witnesses; and did not involve claims of assault or sexual assault. Thus, the citation has little to no probative value as to Jordan's truthfulness or untruthfulness. *See* ER 608(b) and ER 806.

Moreover, the citation alleges possible drug use and that Jordan was ultimately taken into custody based on the alleged false reporting. These allegations create a danger of unfair prejudice, particularly in light of the fact that the citation contains mere allegations. Because the trial court analyzed the relevance, probity, and potential prejudicial effect of admitting the citation and determined that "the prejudicial effect would outweigh whatever very limited probative value there

would be from an allegation of conduct in a different circumstance involving [Jordan]," the trial court did not abuse its discretion when it excluded evidence of the citation. 1 VRP (Oct. 18, 2022) at 369.

### b. No violation of right to present a defense

Because we hold that trial court did not abuse its discretion, we next review de novo the constitutional question—that is, whether the citation's exclusion violated Castillo's right to present a defense. *Broussard*, 25 Wn. App. 2d at 786-87. Castillo argues that Jordan's false reporting citation demonstrated her willingness to lie to the police, which was directly relevant and probative insofar as his defense was that Jordan is not credible and lied to Officer Donaldson about the events that transpired.

Courts must balance the State's interest in excluding evidence against the defendant's need for the information to be admitted. *Jennings*, 199 Wn.2d at 65. Courts will also consider whether the excluded evidence constituted a defendant's entire defense. *Arndt*, 194 Wn.2d at 813.

Here, the trial court excluded evidence of Jordan's citation because it contained allegations, and there was no way for the trial court to assess the truth of those allegations. Moreover, as discussed above, even if the citation was relevant, it had low probative value based on the time that had elapsed between Jordan's incident with Castillo and the events of the citation. Additionally, the subject matter of the citation was completely unrelated, as were the individuals involved. And because the citation contained references to drug use and Jordan being taken into custody, the prejudicial effect was high. Thus, the State had a compelling interest to exclude evidence of the citation.

Looking to Castillo's need for evidence of the citation to be admitted, the record shows that Jordan did not testify at trial nor did she make herself available for interviews in advance of trial. Accordingly, Castillo did not have an opportunity to cross-examine her. However, Castillo testified on his own behalf and provided the jury with his version of events. He was able to present a theory that Jordan was not credible and pointed out to the jury Jordan's failure to testify in court. Indeed, the jury acquitted Castillo of the second degree rape charge, meaning it must not have found Jordan's allegation of sexual assault, as told through the testifying witnesses, sufficiently credible to prove the charge beyond a reasonable doubt. Furthermore, while it was the State who called Jackson as a witness, Jackson's testimony largely corroborated Castillo's. Thus, evidence of the citation did not constitute Castillo's entire defense and clearly did not matter for Castillo's rape charge.

Castillo points to the citation as evidence of Jordan's bias and motivation to lie to the police. While courts have found a constitutional violation in exclusion of evidence of a witness's bias, that bias must be sufficiently specific such that it would expose a witness's motivations as it relates to a particular case. *See Orn*, 197 Wn.2d at 354. It is not simply an attack on a witness's general credibility, which would have been the case here. Even if Jordan had truly made false statements to the police in January 2020, Castillo fails to argue how a lie about a kidnapping involving different individuals in a different context would have demonstrated Jordan's motivation to lie to Officer Donaldson *a year earlier* about assault and sexual assault.[11] Because the citation

---

[11] We also note that under ER 608(b),

> [s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence.

did not constitute Castillo's entire defense and does not demonstrate Jordan's motivation to lie to the police about Castillo, Castillo's right to present a defense was not violated.[12]

B.      CONFRONTATION CLAUSE

1.      Legal Principles

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.  We review confrontation clause challenges de novo.  *State v. Scanlan*, 193 Wn.2d 753, 761, 445 P.3d 960 (2019), *cert. denied*, 140 S. Ct. 834 (2020).  "'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination,'" and it assures the accuracy of the fact-finding process.  *Lee*, 188 Wn.2d at 487 (internal quotation marks and emphasis omitted) (quoting *Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 39 L.Ed. 2d 347 (1974)).

"The confrontation clause prohibits the admission of testimonial statements unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination."  *Burke*, 196 Wn.2d at 725.  A statement is testimonial when its primary purpose is to "'creat[e] an out-of-

---

They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on *cross examination of the witness* (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

(Emphasis added.)  The citation constitutes extrinsic evidence.  Even if Jordan had testified, if she claimed the facts of the citation were not true, Castillo would not have been able to push the matter further.

[12] Castillo also argues that the trial court's exclusion of the citation was not harmless because "Officer Donaldson's testimony was the only evidence establishing the element of strangulation."  Br. of Appellant at 32.  Because we hold that the trial court did not err in excluding evidence of the citation, we do not address Castillo's argument regarding harmless error.

court substitute for trial testimony.'" *Id.* at 726 (quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 1155, 179 L. Ed. 2d 93 (2011)). Nontestimonial statements are statements that have another primary purpose, such as when there is an ongoing emergency or to guide the provision of medical care. *Id.* at 727.

To determine whether out of court statements are testimonial or nontestimonial, courts employ the primary purpose test. *Scanlan*, 193 Wn.2d at 766; *Burke*, 196 Wn.2d at 726. "Courts must determine the primary purpose of an interrogation 'by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs.'" *Burke*, 196 Wn.2d at 726 (quoting *Bryant*, 562 U.S. at 370).

      a.     Statements to law enforcement

Statements made to police officers to investigate or prosecute a crime are generally considered testimonial. *Id.* Additionally, "[s]tatements to police responding to a 911 call [are] testimonial when the declarant describe[s] past events in the presence of police officers in order to help them investigate a crime and it [is] clear the declarant [is] in no immediate danger." *Id.* at 727.

On the other hand, "[w]hen the primary purpose of questioning is to respond to an ongoing emergency, for example, 'its purpose is not to create a record for trial and thus is not within the scope of the [confrontation clause].'" *Id.* at 726 (quoting *Bryant*, 562 U.S. at 358). Several factors help a court determine whether an ongoing emergency exists:

> (1) Was the speaker speaking about current events as they were actually occurring, requiring police assistance, or was he or she describing past events? The amount of time that has elapsed (if any) is relevant. (2) Would a "reasonable listener" conclude that the speaker was facing an ongoing emergency that required help? A plain call for help against a bona fide physical threat is a clear example where a

reasonable listener would recognize that the speaker was facing such an emergency. (3) What was the nature of what was asked and answered? Do the questions and answers show, when viewed objectively, that the elicited statements were necessary to resolve the present emergency or do they show, instead, what had happened in the past? . . . (4) What was the level of formality of the interrogation? The greater the formality, the more likely the statement was testimonial. For example, was the caller frantic and in an environment that was not tranquil or safe?

*Koslowski*, 166 Wn.2d at 418-19 (footnote omitted). "A conversation that begins as an interrogation to learn whether emergency assistance is needed may change and become testimonial once the emergency appears to have ended or the information necessary to meet the emergency has been obtained." *Id.* at 419.

    b.  Statements to SANE

Generally, statements made to medical providers are for the purpose of seeking medical treatment and not to create out-of-court testimony. *Scanlan*, 193 Wn.2d at 767. However, a SANE may share "features with both medical providers and law enforcement because the nurse's duties are to provide medical care *and* to collect evidence." *Burke*, 196 Wn.2d at 729 (emphasis in original).

Thus, courts must identify a singular, dominant purpose to determine whether the statements made to a SANE are testimonial, i.e. whether a SANE is "charged with uncovering and prosecuting criminal behavior" when eliciting statements. *Id.* Typically, "[t]hough documenting and collecting evidence are some of the critical responsibilities of a [SANE], so is providing medical care. [SANEs] provide medical care specific to sexual assault regardless of whether or not the patient wishes to report the crime to police." *Id.* at 731-32 (footnote omitted).

c.      Admissibility of nontestimonial statements

Nontestimonial statements do not implicate the confrontation clause, and courts instead look only to the rules of evidence to determine their admissibility. *Id.* at 740 ("In order for [the witness's] statements to be admissible, they must be nontestimonial *and* comply with the rules of evidence."). We review a trial court's evidentiary rulings for abuse of discretion. *Bartch*, 28 Wn. App. 2d at 573.

"An out-of-court statement used to prove the truth of the matter asserted is inadmissible hearsay under the rules of evidence unless an exception applies." *Burke*, 196 Wn.2d at 740; *see generally* ER 801, 802. An exception is excited utterances. ER 803(a)(2). An "excited utterance" is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2).

Another exception is statements made for the purposes of seeking medical treatment. ER 803(a)(4). Such statements are admissible if they are "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." ER 803(a)(4). "[T]he test for statements made for medical diagnosis or treatments considers the subjective purposes of both the declarant and the medical professional." *Burke*, 196 Wn.2d at 740.

2.      Statements to Officer Donaldson Were Nontestimonial

Castillo argues that Jordan's statements to Officer Donaldson were testimonial statements "because there was no on-going emergency when she made her allegations against Mr. Castillo,"

and the statements should have been prohibited under the confrontation clause. Br. of Appellant at 39. We disagree.

Here, we utilize the primary purpose test to determine whether Jordan's out of court statements to Officer Donaldson are testimonial or nontestimonial. *Scanlan*, 193 Wn.2d at 766; *Burke*, 196 Wn.2d at 726. We must "'objectively evaluate[] the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs.'" *Burke*, 196 Wn.2d at 726 (quoting *Bryant*, 562 U.S. at 370).

The record shows that Officer Donaldson was a traffic officer who pulled over a vehicle at the apartment complex, coincidentally at the very moment Jordan called 911. Officer Donaldson was not dispatched based on Jordan's 911 call and his initial focus was on approaching the driver of the vehicle he had pulled over. Jordan and Hammond ran up to Officer Donaldson, yelling that Jordan had been assaulted by her boyfriend and were "talking over each other." 1 VRP (Oct. 18, 2022) at 407. They both attempted to direct Officer Donaldson's attention to a man they identified as Castillo running away from the apartment complex.

Castillo argues that Jordan's statements to Officer Donaldson were testimonial "because the incident was complete, not 'actually happening' as required for a statement to law enforcement to be non-testimonial." Br. of Appellant at 45. Castillo further asserts that there was no ongoing threat and Officer Donaldson was not concerned that Castillo was going to return to the scene.

However, Officer Donaldson testified that it was "a very chaotic scene." 1 VRP (Oct. 18, 2022) at 407. Officer Donaldson attempted to radio additional police units to assist while watching Castillo "running across the open field . . . and behind [a] bank," while Jordan and Hammond were "talking over each other." 1 VRP (Oct. 18, 2022) at 407. Officer Donaldson had to release the

driver he had pulled over. Additionally, Officer Donaldson testified that Jordan was "animated," "very upset," and "crying" as she recounted the assault. 1 VRP (Oct. 18, 2022) at 408, 409.

The record suggests that the alleged assault had just occurred when Jordan contacted Officer Donaldson and a reasonable listener—here, Officer Donaldson—would conclude that Jordan potentially faced an ongoing emergency. *Koslowski*, 166 Wn.2d at 418-19. Officer Donaldson had no idea who Jordan, Hammond, and Castillo were, their relationship to one another, or whether Castillo posed a danger as he ran from the scene. Jordan and Officer Donaldson were in an exposed, public area. During trial, Officer Donaldson testified:

> I have a male running across the open field . . . and behind the bank. And then, I have the two females that had run over and they're talking over each other. I'm trying to get them to slow down, so I could retain what they're saying as well cutting the driver—I had to get the driver out of there, cause I couldn't do all of that. It was too much.
>
> . . . .
>
> . . . Just a very chaotic scene. . . . Officer safety issues, I don't want to deal with that and turn my back on the car, to deal with [Jordan and Hammond]. I don't want to necessarily turn my back on [Jordan and Hammond] to deal with the car. And I've got a male that just ran off. I don't know what his role is either. And it's just not a very conducive area to conduct a lengthy investigation until the scene is made safe.

1 VRP (Oct. 18, 2022) at 407-08.

It is evident that the questions Officer Donaldson asked Jordan were "to resolve [a] present emergency," so that he could understand what was happening, not to conduct a lengthy or formal investigation. *Koslowski*, 166 Wn.2d at 419. Moreover, Officer Donaldson testified that he only spoke to Jordan for a few minutes, during which Jordan provided, not in response to any questioning, a description of the assault and identified Castillo.

The trial court observed these same facts:

> This was an event that . . . did not take place from a call that [Officer Donaldson] was even sent there to investigate. It's done at the same time as the 911 call is being handled by Ms. Jordan. [Officer Donaldson] is in the unusual position of having pulled over a different driver while he was on duty. And then, there's an immediate, spontaneous event taking place.
>
> He was not dispatched there as I noted. All of those factors indicate this ongoing emergency in light of what the two wom[e]n are exchanging and wanting to reach out and concern with getting his attention, as well as what happens with Mr. Castillo as he's leaving the scene. The concern with safety of them that are involved at that location. And that that concern goes on during the time of this initial conversation between [Officer Donaldson] and Ms. Jordan.

1 VRP (Oct. 18, 2022) at 399.

Thus, because the record supports the finding of an ongoing emergency, the statements Jordan made to Officer Donaldson when Officer Donaldson first arrived on the scene were not for the purpose of creating a trial record and do not implicate the confrontation clause. *Burke*, 196 Wn.2d at 726.

Nontestimonial statements must still comply with the rules of evidence to be admissible. *Id.* at 740. However, Castillo does not present any argument that the statements Jordan made to Officer Donaldson, if nontestimonial, were inadmissible. Moreover, the record shows that during trial, Castillo agreed that Jordan's statements to Officer Donaldson fell within either the excited utterance or present sense impression hearsay exceptions. Accordingly, we hold that the trial court did not err when it determined that Jordan's initial statements to Officer Donaldson were nontestimonial and admitted the statements.[13]

---

[13] Castillo also argues that admission of Jordan's statements to Officer Donaldson was not harmless error. However, because we hold the statements were nontestimonial, we do not address Castillo's harmless error argument.

3.    Statements to SANE Skidmore

Castillo argues that Jordan's statements to Skidmore were also testimonial and should have been excluded under the confrontation clause.    Specifically, Castillo asserts that Jordan's statements to Skidmore were not made for medical treatment and that Skidmore "played an investigatory . . . role." Br. of Appellant at 50.

Skidmore testified to her duties as a SANE: "A SANE is responsible for providing care for patients after a sexual assault.  We collect forensic evidence, conduct a medical history, a medical screening exam and then assist with discharge planning."  1 VRP (Oct. 18, 2022) at 345.  During Skidmore's offer of proof, she testified that knowing the identity of the alleged perpetrator was important so the SANE can assist with "safety concerns at discharge" and that safety planning was part of the treatment that a SANE provides.  1 VRP (Oct. 18, 2022) at 292.

During the examination, Jordan identified Castillo to Skidmore.  Skidmore also testified that in addition to Jordan's allegation of sexual assault, Jordan complained of headache, neck pain, and had mentioned that witnesses saw Castillo with "his arm around [Jordan's] neck."  1 VRP (Oct. 18, 2022) at 351.  Skidmore did not note any visible physical injuries to Jordan's neck.  However, she also stated: "We don't typically see injuries on the neck after a strangulation.  Sometimes we do.  But, the structures on the neck are very soft and can move easily.  And so, it's not uncommon to not see injuries."  1 VRP (Oct. 18, 2022) at 359.

Even assuming without deciding that Jordan's statements to Skidmore violated the confrontation clause, the trial court's admission of those statements constitute harmless error. Violations of the confrontation clause are subject to constitutional harmless error review.  *Orn*, 197 Wn.2d at 359.  "Under the constitutional harmless error standard, the State has the burden of

establishing harmless error beyond a reasonable doubt." *Burke*, 196 Wn.2d at 739. "If the untainted evidence is so overwhelming that it necessarily leads to a finding of the defendant's guilt, the error is harmless." *Koslowski*, 166 Wn.2d at 431.

Here, Skidmore's primary function as a witness was to testify to Jordan's alleged sexual assault and the sexual assault exam that Skidmore conducted. Very little of Skidmore's testimony focused on Jordan's strangulation. And the jury acquitted Castillo of his sexual assault charge.

Castillo argues that admission of Jordan's statements to Skidmore was not harmless because there "would be insufficient evidence of a second-degree assault without Nurse Skidmore's testimony, as it bolstered Officer Donaldson's report." Br. of Appellant at 56. But the record shows that other witness testimony provided the same information to the jury that Castillo now challenges with Skidmore. For instance, Dr. Burke, whose testimony Castillo does not challenge, testified to nearly all the same information as Skidmore related to Castillo strangling Jordan. Dr. Burke conducted a physical exam of Jordan and noted a "mild abrasion to [Jordan]'s left neck." 1 VRP (Oct. 18, 2022) at 338. Dr. Burke also testified that Jordan complained of left-sided neck pain and reported that she had been "choked." 1 VRP (Oct. 18, 2022) at 338. Dr. Burke stated that just because Jordan did not sustain internal injuries to neck, it did not indicate that she had not been strangled. Officer Donaldson testified to Jordan's identification of Castillo. He also testified that Jordan stated Castillo stepped on Jordan's foot, "grabbed her around the neck, upper torso area, [and] squeezed," and that "it interfered with her ability to breathe." 1 VRP (Oct. 18, 2022) at 409. Thus, the overwhelming untainted evidence necessarily leads to a finding of guilt on the second degree assault charge.

Because other witnesses besides Skidmore testified to Jordan's alleged strangulation, even if we assume without deciding that the admission of Jordan's statements to Skidmore was a violation of the confrontation clause, any error was harmless.

## C.    LFOs

Castillo requests that the CVPA, the DV penalty assessment, and the jury demand fee imposed on him by the trial court be stricken. The State concedes that "Castillo is entitled to have these fees stricken from his judgment and sentence as a result of his undisputed indigency." Br. of Resp't at 59. We accept the State's concession, reverse the challenged LFOs, and remand to the trial court to strike those LFOs.

### 1.    Legal Principles

A court shall not impose certain penalties if the court finds that a defendant is indigent. RCW 7.68.035(4). For instance, upon the motion of a defendant, a court shall waive any CVPA imposed prior to July 1, 2023, if that defendant is indigent as defined in RCW 10.01.160(3). RCW 7.68.035(5)(b). RCW 7.68.035 applies prospectively to cases still on direct appeal. *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048, *pet. for review*, No. 102378-2 (Sep. 14, 2023); *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018).

RCW 10.46.190 provides, "Every person convicted of a crime . . . may be liable [for] all the costs of the proceedings against him or her, including, when tried by a jury in the superior court . . . , a jury fee as provided for in civil actions for which judgment shall be rendered and collected." However, "[t]he court shall not order a defendant to pay costs, as described in RCW 10.01.160, if the court finds that the person at the time of sentencing is indigent as defined in RCW

No.  57721-6-II

10.01.160(3)."  RCW 10.46.190.  RCW 10.46.190 applies prospectively to cases on direct appeal.  *See Ellis*, 27 Wn. App. 2d at 16; *Ramirez*, 191 Wn.2d at 749; LAWS OF 2019, ch. 269, § 9.

Additionally, a trial court "may impose a penalty of one hundred dollars . . . on any person convicted of a crime involving domestic violence."  Former RCW 10.99.080 (2015).

An individual may be found indigent based on various criteria, including if they receive "an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level" or are "[u]nable to pay the anticipated cost of counsel for the matter before the court because his or her available funds are insufficient to pay any amount for the retention of counsel."  RCW 10.101.010(3)(c), (d).

2.      LFOs

Here, the trial court found that Castillo was indigent pursuant to RCW 10.101.030(3).  And the trial court entered an order of indigency for the purposes of this appeal.  As this case is on direct appeal, this case was not yet final.  *See Ellis*, 27 Wn. App. 2d at 16; *Ramirez*, 191 Wn.2d at 749.  Thus, as the State concedes, the challenged LFOs should be stricken.  Accordingly,  we reverse the challenged LFOs and remand to the trial court to strike the CVPA, the DV penalty assessment, and the jury demand fee.

CONCLUSION

We affirm Castillo's conviction, reverse the challenged LFOs, and remand to the trial court to strike the CVPA, the DV penalty assessment, and the jury demand fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

No. 57721-6-II

J , J
Lee, P.J.

We concur:

Price, J.

Che, J.

34